734

[Nos. 55217-1-I; 55218-0-I; Division One. June 18, 2012.]
57282-2-I; 57283-1-I.

THE STATE OF WASHINGTON, *Respondent*, v. ATIF AHMAD RAFAY, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. GLEN SEBASTIAN BURNS, *Appellant*.

738

742

*Atif Rafay*, pro se.

*Glen Sebastian Burns*, pro se.

*David B. Koch* (of *Nielsen, Broman & Koch PLLC*), for appellant Rafay.

*Jason B. Saunders* (of *Gordon & Saunders PLLC*) and *Elaine L. Winters* (of *Washington Appellate Project*), for appellant Burns.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Deborah A. Dwyer* and *Brian M. McDonald, Deputies*, for respondent.

*James E. Lobsenz* and *Thomas H. Golden* on behalf of The Innocence Network, amicus curiae.

¶1 LEACH, C.J. — Glen Sebastian Burns and Atif Ahmad Rafay appeal their convictions of three counts of aggravated murder in the first degree, based upon the murders of Rafay's parents and sister. They argue that a complex undercover operation conducted by the Royal Canadian Mounted Police (RCMP) coerced their confessions admitted at trial. But substantial evidence supports the trial court's finding that these confessions were voluntary. And because the other issues presented by Burns and Rafay also do not warrant appellate relief, we affirm.[1]

## Background

¶2 The following is a cursory summary of the facts developed during nearly 8 months of trial and approximately 35 court days of hearings on pretrial motions. Additional facts are set forth as necessary in the analysis of each issue.

¶3 At about 2:00 a.m. on Wednesday, July 13, 1994, Sebastian Burns called 911 to report "some sort of break-in" at the Bellevue home of Atif Rafay's parents. Burns indicated there was blood all over and that Rafay's parents appeared to be dead. Burns and Rafay, both Canadian citizens, had been staying at the home since July 7.

---

[1] Both Burns and Rafay filed separate notices of appeal from the restitution order entered after trial. We consolidated those appeals with their appeals from the underlying convictions. But neither defendant has devoted any argument to the restitution order on appeal. Nor did Rafay address the issue in his statement of additional grounds for review. Defendants have therefore abandoned any challenge to the restitution order on appeal.

¶4 Bellevue police responded to the call within about five minutes and began an extensive investigation. Inside, police found Sultana Rafay, Rafay's mother, on the lower floor of the house and Tariq Rafay, Rafay's father, upstairs in his bed. Both had been bludgeoned to death. They found Basma Rafay, Rafay's sister, gasping and still alive in her room. She later died at the hospital from severe head wounds.

¶5 After Burns and Rafay provided initial statements at the scene, officers drove them to the police station, where each gave a second statement.

¶6 In their statements, Burns and Rafay explained that they had left the house at about 8 p.m. on the evening of July 12 and gone to the Keg Restaurant in Factoria for dinner. They then attended the 9:40 p.m. showing of *The Lion King* at the Factoria Cinema. Theater employees recalled Burns as one of the patrons who had reported a curtain malfunction shortly after the movie began. No one saw Burns or Rafay at the theater after about 10:00 p.m.

¶7 After the movie, the two drove to Steve's Broiler in downtown Seattle, where they arrived about midnight. After leaving the restaurant, Burns and Rafay tried to enter the nearby "Weathered Wall" nightclub but arrived too late. They returned to Steve's Broiler, used the restroom, and drove back to Bellevue. Upon entering the lower level of the house, Burns and Rafay discovered Sultana's body and then Tariq's body upstairs. Rafay heard his sister moaning in her room. He told police that several items appeared to be missing, including his personal stereo and portable compact disc player and a family videocassette recorder (VCR).

¶8 Bellevue police arranged for Burns and Rafay to stay in a Bellevue motel on July 13. Burns and Rafay each gave a third statement on the afternoon of July 14. On Friday, July 15, 1994, without telling the police, Burns and Rafay boarded a bus and returned to Vancouver, B.C. The two did

not attend the family's funeral on Friday afternoon at a Northgate mosque. After staying for several weeks with Burns's parents, Burns and Rafay moved into a North Vancouver house with friends Jimmy Miyoshi and Robin Puga.

¶9 Bellevue police traveled to Vancouver a few days after the murders but were unsuccessful in arranging any further contact with Burns or Rafay. Eventually, Bellevue police asked the RCMP for assistance in obtaining financial information about Burns and Rafay and DNA (deoxyribonucleic acid) samples.

¶10 In January 1995, Bellevue police detectives met with RCMP officers in Vancouver, and the RCMP agreed to assist. The RCMP also opened their own investigation into whether the defendants had been involved in a conspiracy to commit murder while in Canada. The RCMP obtained judicial authority to place wiretaps and audio intercept devices in the defendants' home and in their car and eventually obtained more than 4,000 hours of recordings.

¶11 In April 1995, the RCMP began an undercover operation similar to others it used in many Canadian cases over the years. Dubbed "Project Estate," undercover officers posed as the leaders of a successful criminal organization. Sergeant Al Haslett and Corporal Gary Shinkaruk were the primary undercover operators, with Haslett acting as "Mr. Big," the apparent head of the fictitious organization, and Shinkaruk as his subordinate. The operation eventually planned and carried out the following 12 "scenarios" in an effort to secure confessions:

¶12 *No. 1 April 11, 1995.* For the initial meeting, Shinkaruk staged an encounter with Burns outside a hair salon after Burns had a haircut. Shinkaruk told Burns that he had locked his keys in his car and asked for a ride back to his hotel. When Burns mentioned he needed $200,000 for a movie he was planning, Shinkaruk offered to introduce him to "Al" as a possible investor. Shinkaruk accompanied

Burns to a strip club and introduced him to Haslett. Burns expressed interest in Haslett's offer to earn extra money.

¶13 *No. 2 April 13, 1995.* Haslett contacted Burns and directed him to drive with Shinkaruk to Whistler, where the two met with Haslett. When Haslett asked Burns to drive a stolen car back to Vancouver, Burns appeared pale and expressed concern about the plan. Burns eventually drove what he believed to be a stolen car back to Vancouver, where Haslett paid him $200. Burns repeatedly expressed his dissatisfaction with the amount he had earned and his lack of participation in the planning of the operation. Burns indicated he was willing to participate in more lucrative future operations, including selling drugs and acting as a "hit man."

¶14 *No. 3 April 20-21, 1995.* Shinkaruk left a telephone message for Burns. Burns returned the call and indicated his willingness to meet with Shinkaruk in a few days.

¶15 *No. 4 May 6, 1995.* At the Four Seasons Hotel, an undercover officer, dressed as a biker, displayed two guns and delivered a large amount of cash to Shinkaruk. Burns watched and then helped Shinkaruk count the money. Shinkaruk told Burns he had "fuckin' toasted a guy," but Haslett had made sure the witness was unavailable for trial.

¶16 During the meeting, Burns disclosed that he and a friend were suspects in the Bellevue murders. Burns claimed that he now had enough money to make his movie but remained interested in certain future opportunities, including money laundering and drug sales. He also said he would not have "any dilemma" about killing someone for the organization and that "anything goes." Burns repeatedly resisted Hazlett's questions about committing the murders but also indicated his desire to learn more about what the Bellevue police knew and to have evidence destroyed.

¶17 *No. 5 May 29-30, 1995.* Shinkaruk became concerned that a recent newspaper article may have compromised the operation. He called Burns. Burns said he was glad to hear from Shinkaruk and was available to meet with him. Shinkaruk said he would call the next day and set up a meeting. After the call, the electronic intercept recorded Burns singing, "I'm a happy man." When Shinkaruk called the next day, he told Burns that Haslett was busy and nothing would be scheduled that day. Burns expressed disappointment.

¶18 *No. 6 June 15-16, 1995.* On June 13, 1995, Shinkaruk called Burns and asked if he was interested in making some money. Shinkaruk invited Burns to bring a trusted friend and meet him at the Royal Scott Hotel in Victoria. Burns asked Miyoshi to join him. The two met with Haslett and Shinkaruk in Victoria on June 15, 1995. For two days, Burns and Miyoshi assisted Shinkaruk with "money laundering" by making cash deposits totaling about $100,000 into various bank automated teller machines. Haslett provided Burns and Miyoshi with spending money and $2,000 at the end of the second day.

¶19 During the course of the encounter, Burns twice asked Haslett what he had learned about the Bellevue investigation. Haslett said he had someone investigating the matter and would inform Burns what he learned. Haslett also discussed computer skills with Burns and Miyoshi, suggesting future employment possibilities. After Haslett and Shinkaruk left, Burns told Miyoshi that "[t]his has been the coolest thing ever[;] I couldn't ask for anymore [sic]."

¶20 *No. 7 June 20, 1995.* After calling Burns and telling him they might visit, Haslett and Shinkaruk appeared at the defendants' house. Haslett discussed Burns's computer knowledge and system, and told Burns he would soon be hearing from a friend with information about the Bellevue police investigation. Burns warned Haslett that the house was bugged.

¶21 *No. 8 June 28-29, 1995.* Burns and Miyoshi returned to Victoria for a second round of money laundering. Haslett arranged to speak alone with Burns and told him that the Bellevue police had him "in a pretty big fucking way." Haslett mentioned that the police had evidence of Burns's DNA, his hair found in the shower mixed with the victims' blood, and Burns's fingerprints on a box. Haslett said he needed more details in order to help Burns.

¶22 Burns repeatedly deflected Haslett's attempts to elicit concrete details about the murders but provided some veiled responses suggesting his participation and a financial motive. Burns also expressed concern that Haslett was an undercover officer. Haslett discussed computers again with Burns but did not pay Burns or Miyoshi for their assistance.

¶23 *No. 9 July 10, 1995.* To avoid appearing to focus on Burns, Haslett and Shinkaruk arranged a money laundering operation involving only Miyoshi. Miyoshi did not reveal any details about the murders.

¶24 *No. 10 July 18, 1995.* Burns agreed to meet with Haslett and Shinkaruk at the Ocean Point Hotel in Victoria. At the hotel, Haslett discussed the organization's computer needs with Burns. Haslett then showed him a fake Bellevue Police Department memorandum that indicated the police would soon call a press conference and that charges would be filed against Burns and Rafay once the culturing of Burns's DNA was completed. Haslett told Burns that things would be happening quickly and that the police were "coming to lock your ass up."

¶25 After studying the report and discussing with Haslett the specific items of evidence that it listed, Burns insisted that the items all had potentially innocent explanations. Burns eventually acknowledged, however, that he wanted Haslett's help. Haslett told Burns that he could arrange for his associate to destroy the evidence, but that

he would not do so until Burns told him the complete details of the murders. Haslett explained that the associate could not destroy all of the evidence unless he knew the details of the crime.

¶26 Burns eventually told Haslett specific details about his and Rafay's participation in the murders. A hidden camera recorded Burns's confession.

¶27 *No. 11 July 19, 1995.* Haslett told Burns to call Rafay and ask him to come to Victoria. While waiting for Rafay to arrive, Burns accompanied Shinkaruk to the city of Nanaimo, where Shinkaruk staged an encounter with another undercover officer. While Burns stood guard, Shinkaruk appeared to rough up the man in order to obtain more than $100,000 that he owed to Haslett. Shinkaruk and Burns then returned to Haslett's hotel room, where all three men counted the money. Burns provided additional details about the murders to Haslett.

¶28 Rafay arrived, and Haslett spoke at length with him in Burns's presence. Haslett discussed the details of the Bellevue memo with Rafay and repeatedly emphasized the importance of trust. Rafay reassured him that Burns was his best friend and that he would never betray him. Rafay then provided details about his participation in the murders. He explained that he had watched Burns kill his mother and had removed the family VCR but had not otherwise participated in the killings. When asked why they had killed his parents, Rafay responded that it was to "become richer and more prosperous and more successful." Burns also added additional details about the killing of Basma, which "took a little more bat work" than he had expected. The RCMP also videotaped Rafay's confessions.

¶29 *No. 12 July 26, 1995.* In the final scenario, Burns and Miyoshi met with Haslett at the Landis Hotel in Vancouver. At Burns's urging, Miyoshi told Haslett that he knew about the plan to kill Rafay's parents about a month

in advance. He explained that he did not go to Bellevue with the defendants because he was too busy at work.

¶30 On July 31, 1995, Burns and Rafay were charged in King County with three counts of aggravated first degree murder. On the same day, the RCMP arrested them and charged them as fugitives. King County requested extradition of Burns and Rafay and refused to waive the potential application of the death penalty. After protracted litigation, the Canadian Supreme Court ruled on February 15, 2001, that the defendants could not be extradited without a waiver of the death penalty. King County then provided the required assurances. Burns and Rafay were transported to Washington and arraigned on April 6, 2001.

¶31 Miyoshi eventually told officers that he had known about the planned murders and discussed the plan with the defendants. When Burns and Rafay returned to Canada after the murders, they told Miyoshi certain details about the killings. Miyoshi entered into an immunity agreement and in August 2003 participated in a videotaped preservation deposition that was played at trial.

¶32 After a series of delays caused in part by the need to appoint new attorneys, testimony on the defendants' motions to suppress their confessions began on April 22, 2003, and concluded on August 6, 2003. Jury selection began on October 10, 2003, and concluded on November 13, 2003. Opening statements began on November 24, 2003, and closing statements concluded on May 20, 2004. The jury returned its verdict on May 26, 2004, finding the defendants guilty as charged. At sentencing on October 24, 2004, the court imposed three terms of life imprisonment without the possibility of parole on each defendant.

## Analysis

*Issue 1: Whether the Defendants' Confessions Were Improperly Coerced, Thereby Violating Their Rights under the Federal and State Constitutions*

¶33 Defendants contend the admission of their confessions to the RCMP undercover officers violated their rights under the Fifth and Fourteenth Amendments and article I, section 9 of the Washington Constitution.[2] They argue that the undercover officers coerced the confessions by means of an unprecedented combination of threats of arrest, prison, and harm or death, and other extraordinary measures that rendered the statements involuntary. But the evidence amply supports the trial court's conclusion that the confessions were voluntary and not coerced.

### Suppression Hearing

¶34 In April 2003, defendants moved to suppress evidence of their confessions, arguing that the Bellevue police assisted to such a degree in the RCMP undercover operation that the "silver platter" doctrine did not shield the admission of evidence gathered during the Canadian operation, including the electronic intercepts, from Washington law.[3] They also challenged admission of the confessions as coerced and involuntary under the Fifth and Fourteenth Amendments.

---

[2] The rights against self-incrimination under the Fifth Amendment and article I, section 9 of the Washington Constitution are coextensive. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).

[3] *See generally State v. Fowler*, 157 Wn.2d 387, 396, 139 P.3d 342 (2006) (summarizing current status of silver platter doctrine).

The principles of the doctrine (although no longer explicitly called the silver platter doctrine) still are applied in federal court, such as when evidence is obtained out of the country, in violation of the Fourth Amendment, which does not govern foreign officials' conduct. *See, e.g., Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968) (evidence obtained in the Philippines in violation of the Fourth Amendment by foreign agents was admissible in federal court when the

¶35 After a lengthy hearing, at which neither defendant testified, the trial court denied the motion to suppress. The court concluded that the relationship between the Bellevue police and the RCMP was insufficient to convert the RCMP into an agent of the Bellevue police for purposes of the silver platter doctrine. The court also rejected the defendants' challenge, based on *Franks v. Delaware*,[4] to the validity of the Canadian search warrant. The court addressed only briefly defendants' claim that their confessions were coerced:

> The defendants do clearly enjoy the protections of the U.S. Constitution, the Fifth, Sixth, and the 14th Amendment[s], insofar as due process. Were defendants' rights under these laws violated? The court's answer is no.
>
> The statements of defendants were given, unlike Mr. Fulminante and unlike Galileo, in a noncustodial setting. The defendants were free to speak or not. The defendants were free to leave or not. The defendants were free to consult their Canadian counsel or not, as they chose.
>
> The Canadian court reviewed and found no evidence of coercion, and this court makes the same finding. The Canadian court, in reviewing the self same issue under Canadian charter rights, found no duress, found nothing under Canadian police standards that would bring the administration of justice into disrepute.

¶36 The court incorporated this portion of its ruling into finding of fact 15 and conclusion of law 6, which the defendants challenge on appeal:

> [Finding of fact] 15. During the course of the extradition proceedings in Canada, the Court of Appeals for British Columbia found the undercover technique used by the RCMP and the resulting interception and recording of the defendants' commu-

---

federal officers did not undertake or unlawfully participate in the unconstitutional search and seizure).

*Fowler*, 157 Wn.2d at 396 n.5; *see also State v. Gwinner*, 59 Wn. App. 119, 126-27, 796 P.2d 728 (1990).

[4] 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

nications did not violate the defendants' rights under Canada's Charter of Rights and Freedoms, nor did it offend the sensibilities of the Canadian citizenry. The Court of Appeals for British Columbia further found that there was no duress or coercion employed by the RCMP during the undercover scenarios in order to obtain the defendants' admissions. The Supreme Court of Canada did not disturb this finding. This Court agrees with the Canadian courts and finds the same.

. . . .

[Conclusion of law] 6. The defendants' statements and admissions to undercover RCMP officers during the course of the undercover scenarios were not the product of coercion or duress and their admission into evidence will not violate the defendants' due process rights, right to counsel or right against self incrimination guaranteed by the State and Federal Constitutions. The statements at issue were made in a non-custodial setting. The defendants were free to leave or not leave. The defendants were free to speak or not speak. The defendants were free to consult their Canadian counsel or not as they chose.[5]

On appeal, defendants limit their challenge to the trial court's determination that their confessions were voluntary under the Fifth and Fourteenth Amendments.

*Standard of Review*

¶37 In *State v. Broadaway*,[6] our Supreme Court rejected the principle of an independent appellate review of the record in a confession case:

We hold that the rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record.

Consequently, when reviewing a trial court's conclusion of voluntariness, an appellate court determines "whether there

---

[5] We review the findings of fact included in conclusion of law 6 as findings of fact. *See State v. Hutsell*, 120 Wn.2d 913, 918-19, 845 P.2d 1325 (1993).

[6] 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

is substantial evidence in the record from which the trial court could have found that the confession was voluntary by a preponderance of the evidence."[7]

■■ ¶38 The voluntariness of a confession necessarily depends on the totality of the circumstances in each case, including whether it was "coerced by any express or implied promise or by the exertion of any improper influence."[8] Potentially relevant circumstances include the " 'crucial element of police coercion' "; the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and, in cases of custodial interrogation, whether the police advised the defendant of the right to remain silent and to have counsel present.[9] A police officer's promises or psychological ploys may play a part in a defendant's decision to confess, " 'but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.' "[10]

¶39 Defendants contend that Project Estate employed coercive techniques on an unprecedented scale against young and naïve suspects. Initially, the undercover operation sought to entice defendants by projecting an attractive life-style for participants in a criminal organization. When the operation's initial scenarios did not persuade Burns to confess, the officers arranged a series of "money laundering" tasks, for which Burns received several thousand dollars for negligible work. Haslett also implied the defendants could provide future computer consulting services for the organization once their legal troubles were eliminated.

---

[7] *Broadaway*, 133 Wn.2d at 129; *see also Unga*, 165 Wn.2d at 112.

[8] *Unga*, 165 Wn.2d at 101; *see also Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

[9] *Unga*, 165 Wn.2d at 101 (quoting *Withrow v. Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

[10] *Unga*, 165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)).

¶40 Defendants rely primarily on evidence that Haslett and Shinkaruk created the image of a criminal organization that was willing to use guns and violence if necessary to protect its interests. During the scenario on May 6, 1995, Shinkaruk informed Burns that he had killed someone in the past, and Haslett suggested he had had a witness "eliminated." On July 19, 1995, the day after Burns's videotaped confession, Burns accompanied Shinkaruk to a staged incident and stood guard while Shinkaruk purportedly punched someone in order to collect money. Haslett repeatedly stressed that he valued loyalty above all else and expressed concern that defendants might betray the organization if they ever went to jail. Defendants argue that the officers' comments and actions impliedly threatened violence or death if the police arrested the defendants, who would then pose some risk of revealing the organization's secrets to the police.

¶41 Defendants maintain that in order to create a sense of urgency and finally persuade them to abandon their steadfast refusal to provide details about the murders, Haslett confronted Burns with a fake Bellevue Police Department memorandum and repeatedly admonished him that arrest was imminent unless defendants agreed to Haslett's plan to destroy evidence. That plan not only promised defendants an unhindered opportunity for future participation in the organization, it also eliminated the possibility that they would spend time in jail, where they posed a threat of disclosing information about Haslett and Shinkaruk to the police. Defendants provided details about the murders only after Haslett's offer to eliminate future criminal liability.

¶42 Defendants argue that these circumstances, considered together, were so coercive they prevented the defendants from making a rational decision. Defendants claim they confessed only as a direct result of this final threat in order to avoid arrest, prosecution, and possible death.

¶43 Neither side has identified any case involving facts remotely approaching the scope of the Project Estate undercover operation. As they did in the trial court, defendants rely primarily on *Arizona v. Fulminante*.[11]

¶44 In *Fulminante*, Arizona police suspected that the defendant had killed his young stepdaughter but had insufficient evidence to support charges. Fulminante later went to New Jersey, where he was convicted of an unrelated federal crime and incarcerated in New York. In prison, Fulminante became acquainted with Sarivola, a former police officer serving a sentence for extortion. Sarivola was a paid FBI (Federal Bureau of Investigation) informant, who masqueraded in prison as an organized crime figure. After hearing a rumor that Arizona authorities suspected Fulminante of a child murder, Sarivola raised the subject of the murder with Fulminante several times. Fulminante repeatedly denied any involvement. Sarivola passed information about his conversations to the FBI, which asked him to find out more.

¶45 Sarivola told Fulminante he knew that Fulminante was " 'starting to get some tough treatment and what not' " from other inmates because of the rumor and offered to protect him.[12] Sarivola explained that in order to help with this problem, Fulminante would have " ' "to tell me about it." ' "[13] Fulminante then admitted that he had murdered his stepdaughter.

¶46 The Arizona Supreme Court reversed Fulminante's conviction. Noting that Fulminante, an alleged child murderer, faced the danger of physical harm from other inmates and that Sarivola was aware of Fulminante's " ' "rough treatment from the guys," ' " the Arizona court determined

---

[11] 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

[12] *Fulminante*, 499 U.S. at 283.

[13] *Fulminante*, 499 U.S. at 283.

that Fulminante tendered his confession as a direct result of Sarivola's " ' "extremely coercive" ' " promise of assistance and in the belief that his life was in jeopardy if he did not confess.[14]

¶47 The United States Supreme Court affirmed the Arizona court's analysis:

Although the question is a close one, we agree with the Arizona Supreme Court's conclusion that Fulminante's confession was coerced. The Arizona Supreme Court found a credible threat of physical violence unless Fulminante confessed. Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient. As we have said, "coercion can be mental as well as physical, and ... the blood of the accused is not the only hallmark of an unconstitutional inquisition." As in *Payne* [*v. Arkansas*, 356 U.S. 560, 78 S. Ct. 844, 2 L. Ed. 2d 975 (1958)], where the Court found that a confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door, so too here, the Arizona Supreme Court found that it was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess. Accepting the Arizona court's finding, permissible on this record, that there was a credible threat of physical violence, we agree with its conclusion that Fulminante's will was overborne in such a way as to render his confession the product of coercion.[15]

¶48 The Court also identified additional facts in the record, not relied upon by the Arizona court, that supported a finding of coercion:

Fulminante possesses low average to average intelligence; he dropped out of school in the fourth grade. He is short in stature

[14] *Fulminante*, 499 U.S. at 286 (quoting *State v. Fulminante*, 161 Ariz. 237, 243-44 & n.1, 778 P.2d 602 (1988)).

[15] *Fulminante*, 499 U.S. at 287-88 (first alteration in original) (footnotes and citations omitted) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960)).

and slight in build. Although he had been in prison before, he had not always adapted well to the stress of prison life. While incarcerated at the age of 26, he had "felt threatened by the [prison] population," and he therefore requested that he be placed in protective custody. Once there, however, he was unable to cope with the isolation and was admitted to a psychiatric hospital. The Court has previously recognized that factors such as these are relevant in determining whether a defendant's will has been overborne.[16]

¶49 Defendants also rely on *United States v. McCullah*,[17] in which the defendant facilitated the killing of the wrong person during an assignment for a drug supplier. A police informant, who had previously been a member of the drug organization, took McCullah on a "long drive into the mountains," informed him that the drug organization was planning to kill him because of the mistake, and offered to intercede with the organization on McCullah's behalf if he told him the truth. In response, McCullah admitted the details of the killing and offered to return and complete the job.[18] On appeal, the court found that as in *Fulminante*, McCullah's statements were coerced "by a credible threat of violence."[19]

¶50 The circumstances in both *Fulminante* and *McCullah* differ fundamentally from those in this case. In both decisions, the defendants confessed in response to what the courts stressed were credible threats of physical harm. Although Haslett and Shinkaruk portrayed their criminal organization as one that had used violence on occasion to achieve its goals or protect its members, the record does not indicate that they ever threatened the

---

[16] *Fulminante*, 499 U.S. at 286 n.2 (alteration in original) (citations omitted).

[17] 76 F.3d 1087 (10th Cir. 1996).

[18] *McCullah*, 76 F.3d at 1100.

[19] *McCullah*, 76 F.3d at 1101.

defendants with physical harm or placed them in a position suggesting they were subject to imminent physical harm.

¶51 Moreover, the interaction between the defendants and the undercover officers in this case encompassed a period of several months. As the trial court stressed, the defendants were free to break off their contact with the undercover officers at any time. On one occasion, weeks passed with no contact between the participants. Throughout the undercover operation, defendants pursued their normal and chosen activities with no interference from the undercover officers.

¶52 During Project Estate, the defendants repeatedly pursued their contacts with Haslett and Shinkaruk; expressed their willingness to participate in the organization's criminal activities, including acts of violence; and requested Haslett's assistance in avoiding future prosecution. Defendants do not identify any evidence in the record suggesting that their age, mental abilities, education, emotional condition, or specific personality traits left them unusually vulnerable to coercive measures. Nor does the record establish that the defendants were financially dependent on the money they received from Haslett.

¶53 Throughout the entire undercover operation, Burns, who essentially managed the relationship with Haslett and Shinkaruk on behalf of the defendants, exhibited a remarkable resilience to continued pressure. In the earlier scenarios, Burns was not intimidated and resisted Haslett's repeated attempts to extract information about the murders. Although Burns appeared scared or nervous during the stolen car scenario, he did not hesitate to complain afterward about the amount of money he had earned and his unhappiness about not participating in the planning of the operation. Burns clearly attempted to leverage the incident to a more lucrative relationship with the organization. Even when confronted with the fake police memo,

Burns firmly and accurately responded that the purported evidence was equivocal and was either easily explained or simply unrelated to the defendants' actions during the murders.

¶54 Although defendants claim they confessed out of fear of physical injury, Burns expressly raised the subject with Haslett on several occasions, casually asserting his expectation that someone in the organization would shoot him if he ever betrayed it. But Haslett repeatedly suggested to Burns that if things did not work out, the parties would just walk away from one another. During the second money laundering scenario in Victoria, Haslett commented that Burns only had Shinkaruk's pager number and informed him that if mistakes were made, the "pager will be fuckin' thrown in the fuckin' ocean and that'll be the end of it." Near the end of the confession recording, Burns assures Haslett that he can trust him because otherwise "some guy [would come and] blast me in the head." In response, Haslett insists that he is "not a killer" and that because he and Burns have not done anything together at this point, either one is free to walk away if there is a lack of trust. Haslett also repeatedly asserts that Burns is free to talk to his attorney. Burns's actions throughout suggest deliberate attempts to impress Haslett, not fear of physical injury.

¶55 Significantly, unlike any of the authorities cited on appeal, the record in this case includes many hours of audio and video recordings made in the defendants' house and during the various scenarios. Those recordings provided a uniquely rich context for assessing the effect of the under-cover operations on the defendants. The trial court was therefore able to view the defendants' demeanor and body language during the entire confessions, including their jovial delight in revealing certain details about the murders and Rafay's calm explanation that his feelings about killing his parents and sister were tempered by the fact that "[i]t

was necessary to . . . achieve what I wanted to achieve in this life. . . . I think of it as a sacrifice . . . a sort of injustice in the world that basically, basically forced me or, and Sebastian, to . . . have to do the thing." This documentation severely undermined the defendants' claims that the undercover operations overcame their will to resist.

¶56 Viewed in their entirety, the circumstances in the case, including the defendants' private conversations, their participation in the scenarios leading up to the confessions, and their conduct and statements during the confessions themselves, indicate that Project Estate did not vitiate the defendants' ability to make independent or rational decisions or otherwise overcome their will. Although psychological and financial factors undoubtedly played a role in the relationship between the defendants and the undercover officers, the record does not indicate that those extrinsic considerations were overwhelming. Rather, defendants made a deliberate choice after weighing competing options, including their long-term personal goals, to accept the assistance of another criminal to eliminate their legal problems. A confession is voluntary " 'so long as that decision is a product of the suspect's own balancing of competing considerations.' "[20] The evidence in the record strongly supports the trial court's determination that defendants' confessions were voluntary.

¶57 As defendants correctly assert, the trial court entered minimal written findings and conclusions on their coercion claim. This reflected not only the State's casual response to this particular claim but also the defendants' extensive arguments and testimony directed to their alternative grounds for relief: the unavailability of the silver platter doctrine and the alleged inaccuracies and misstatements contained in the Canadian applications for wiretap approval.

---

[20] *Unga*, 165 Wn.2d at 102 (quoting *Miller*, 796 F.2d at 605).

¶58 But the record does not support the defendants' contention that the trial court merely relied on the Canadian court determination that the confessions were voluntary under Canadian law.[21] In finding of fact 15, consistent with its oral decision, the trial court recited that the Canadian courts determined the RCMP had not employed duress or coercion to obtain the admissions and that "[t]his Court agrees with the Canadian courts and finds the same." When viewed in context, however, and in conjunction with its oral ruling, it is apparent that the trial court considered and resolved the claim of coercion independently under the Fifth and Fourteenth Amendments. The court's expression of agreement with the Canadian court's conclusion does not reflect a failure to apply the proper legal standard.[22]

*Issue 2: CrR 3.3 and Constitutional Speedy Trial*

¶59 Burns and Rafay next contend that the State violated their speedy trial rights under both CrR 3.3 and the state and federal constitutions.[23] They argue that the State's stubborn pursuit of extradition, without providing assurances that they would not be subject to the death penalty, constituted a failure to exercise good faith and due diligence, and unnecessarily delayed the defendants' trial for almost six years. But because the defendants were not

---

[21] Canadian courts apply a significantly different standard when determining whether a confession is voluntary. Under Canadian law, concerns about a coerced confession do not generally arise unless the defendant confesses to someone he or she perceives to be a "person in authority." *See R. v. Grandinetti*, 2005 SCC 5, para. 37, [2005] 1 S.C.R. 27 (Can.).

[22] Defendants' challenge to conclusion of law 1, in which the court stated that defendants were not "entitled to the full panoply of rights guaranteed by our Federal and State Constitutions," is misplaced. That portion of the court's ruling clearly pertained to the defendants' Fourth Amendment challenges and is therefore irrelevant to the issues raised on appeal.

[23] Article I, section 22 of the Washington Constitution does not afford a defendant greater speedy trial rights than the Sixth Amendment. *State v. Iniguez*, 167 Wn.2d 273, 285-90, 217 P.3d 768 (2009).

amenable to process until the Canadian extradition proceedings were completed, CrR 3.3 does not require an inquiry into whether the State acted in bad faith or with due diligence. Moreover, the defendants' resistance to extradition was the primary cause of the delay. Consequently, they cannot demonstrate a constitutional violation of their speedy trial rights.

¶60 On July 31, 1995, the State charged Burns and Rafay with three counts of aggravated first degree murder. The RCMP arrested the defendants on the same day. Under certain circumstances, Washington law authorizes imposition of the death penalty for aggravated murder.[24]

¶61 The United States formally requested extradition on September 25, 1995. Article 6 of the extradition treaty between the United States and Canada provides,

> When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition *may* be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.[25]

On July 12, 1996, the Canadian minister of justice signed the extradition order, concluding there were no special circumstances requiring the death penalty assurances.

¶62 Burns and Rafay appealed the minister's decision. On June 30, 1997, in a 2-1 decision, the British Columbia Court of Appeal set aside the minister's order and directed him to seek the article 6 assurances.[26] The Canadian

---

[24] RCW 10.95.030(2).

[25] Treaty of Extradition, U.S.-Can., art. 6, June 28-July 9, 1974, 27 U.S.T. 985 (entered into force Mar. 22, 1976) (emphasis added).

[26] *United States v. Burns* (1997), 94 B.C.A.C. 59, 116 C.C.C. 3d 524, 8 C.R. 5th 393 (Can. B.C. C.A.). The Court of Appeal unanimously rejected the defendants' challenge to the sufficiency of the evidence to support their prosecution, including

Supreme Court accepted the minister's request for further review.

¶63 On February 15, 2001, the Canadian Supreme Court affirmed the Court of Appeal's decision. The Court concluded that in light of recent developments, including Canada's complete rejection of the death penalty, the international opposition to the death penalty, the relative youth of the defendants, increasing concerns about potential wrongful convictions, and the lengthy delays and psychological trauma endured by death row inmates, death penalty assurances "are constitutionally required in all but exceptional cases" and that the current case did not present exceptional circumstances.[27] The Court expressly noted, however, that the extradition treaty *permitted*—but did not require—the requested State to condition extradition on the provision of death penalty assurances and that the Canadian Charter of Rights and Freedoms did not "lay down a constitutional prohibition in all cases against extradition unless assurances are given that the death penalty will not be imposed."[28]

¶64 On March 21, 2001, after the King County Prosecutor's Office provided the necessary death penalty assurances, the minister issued the surrender order, and Burns and Rafay were turned over to the United States. They were arraigned on April 6, 2001.

¶65 Both defendants eventually moved to dismiss under CrR 3.3 for violation of their speedy trial rights, arguing that the State unnecessarily delayed their arraignment after the filing of charges. The trial court denied the motion on February 18, 2003, concluding that the defendants were

the reliability of their confessions under Canadian law, and the Canadian Supreme Court denied further review.

[27] *United States v. Burns*, 2001 SCC 7, para. 8, [2001] 1 S.C.R. 283 (Can.).

[28] *Burns*, [2001] 1 S.C.R. at 296-97, ¶ 8.

not amenable to process until the Canadian Supreme Court ruled on the extradition issue and that the State had no obligation to waive the potential application of the death penalty until Canadian legal proceedings were concluded.

¶66 We review alleged violations of the speedy trial rule and the constitutional right to a speedy trial de novo.[29]

¶67 As construed in *State v. Striker*[30] and *State v. Greenwood*,[31] former CrR 3.3 imposed a constructive arraignment date 14 days after the State filed an information if there was an unnecessary delay in bringing a defendant before the court.[32] Under *Striker/Greenwood*, a delay was unnecessary if the defendant was amenable to process and the State failed to exercise due diligence to bring the defendant before the court.[33] The defendant bears the burden of establishing amenability to process; the State must demonstrate that it acted with due diligence in attempting to bring the defendant to trial.[34]

¶68 Generally, "amenable to process" means that the defendant is liable or subject to Washington law.[35] "One is not amenable to process when, even if he can be found, he is not subject to the law because the courts cannot obtain jurisdiction over him."[36] A defendant located outside the

---

[29] *See State v. Kenyon*, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009) (examining CrR 3.3); *Iniguez*, 167 Wn.2d at 281 (examining Wash. Const. art. I, § 22 and U.S. Const. amend. VI).

[30] 87 Wn.2d 870, 557 P.2d 847 (1976).

[31] 120 Wn.2d 585, 845 P.2d 971 (1993).

[32] Significant changes to CrR 3.3, effectively superseding the *Striker/Greenwood* rules, became effective September 1, 2003.

[33] *State v. Hudson*, 130 Wn.2d 48, 54, 921 P.2d 538 (1996).

[34] *See State v. Roman*, 94 Wn. App. 211, 216, 972 P.2d 511 (1999).

[35] *State v. Stewart*, 130 Wn.2d 351, 361, 922 P.2d 1356 (1996).

[36] *State v. Lee*, 48 Wn. App. 322, 325, 738 P.2d 1081 (1987); *Stewart*, 130 Wn.2d at 361.

state of Washington, even if subject to an extradition request, is not amenable to process for purposes of CrR 3.3 " 'until extradition procedures are completed.' "[37] When a defendant is not amenable to process, whether the State exercised good faith and due diligence to bring the defendant before the court is irrelevant to application of the *Striker* rule.[38]

¶69 The defendants' reliance on *State v. Anderson*[39] is misplaced. The *Anderson* court concluded that former CrR 3.3(g)(6), which tolled the time for trial when a defendant was held in an out-of-state or federal prison or jail, imposed an independent duty of good faith and due diligence on the State to bring the defendant to trial, including the obligation to use extradition or the Interstate Agreement on Detainers.[40] But subsequent decisions have clarified that *Anderson* did not change the general rule that a defendant is not amenable to process until extradition procedures are completed and provides an exception only when "an incarcerated out-of-state defendant is affirmatively seeking to waive extradition and return to this state for speedy trial."[41]

¶70 Unlike the defendant in *Anderson*, Burns and Rafay resisted extradition until after the Canadian Supreme Court's decision, when King County offered the necessary death penalty assurances. They claim that they were amenable to process because the State merely had to provide the necessary death penalty assurances, either at the time

---

[37] *Stewart*, 130 Wn.2d at 361 (quoting *Lee*, 48 Wn. App. at 325); *accord Roman*, 94 Wn. App. at 217; *State v. Galbreath*, 109 Wn. App. 664, 671, 37 P.3d 315 (2002) (defendant becomes amenable to process on date on which he or she exhausts or waives extradition rights).

[38] *Stewart*, 130 Wn.2d at 363-64.

[39] 121 Wn.2d 852, 855 P.2d 671 (1993).

[40] *Anderson*, 121 Wn.2d at 865; ch. 9.100 RCW; *see Stewart*, 130 Wn.2d at 364.

[41] *Roman*, 94 Wn. App. at 217; *see also Stewart*, 130 Wn.2d at 365-66.

it filed the extradition request or, at the latest, when the British Columbia Court of Appeal reversed the minister's surrender order.

¶71 Essentially, the defendants maintain that the State was required to bargain away the right to seek the death penalty before the extradition proceeding was concluded. They provide no authority or reasoned legal argument to support the imposition of such an obligation.

¶72 Defendants' allegations of an unnecessary delay rest in part on the false assumption that Canadian law bars the extradition of Canadian citizens to the United States to face the death penalty. But as the Canadian Supreme Court noted in its decision, the Canadian Constitution does not prohibit outright the extradition of Canadian citizens without death penalty assurances, and the minister of justice retains discretion under the extradition treaty to order extradition without death penalty assurances. The British Columbia Court of Appeal's decision did not conclude the legal dispute because the Canadian Supreme Court accepted further review. Defendants have not identified any Canadian law that obligated the State to waive its efforts to extradite the defendants to face the death penalty before the Canadian legal proceedings concluded.

¶73 Under the circumstances, the defendants were not amenable to process for purposes of CrR 3.3 until the extradition proceedings were complete. Accordingly, we do not inquire into whether the State exercised good faith or due diligence in bringing the defendants to trial. The State did not violate the defendants' speedy trial rights under CrR 3.3.

¶74 Defendants also contend that the long trial delay violated their Sixth Amendment right to a speedy public trial. The State urges this court to decline to address the constitutional speedy trial claim because it was not presented to the trial court. However, we need not decide

whether the alleged error was properly preserved at trial or satisfies the requirements of RAP 2.5 because the constitutional speedy trial claim fails in any event.

██ ██ ¶75 When determining whether a trial delay is unconstitutional under the Sixth Amendment, a court considers the balancing test set forth in *Barker v. Wingo*.[42] As a threshold matter, the defendant must first demonstrate "that the length of the delay crossed a line from ordinary to presumptively prejudicial."[43] This determination is necessarily dependent on the specific circumstances of the case, including the type of case and its complexity.[44]

¶76 The State concedes that the nearly six-year delay from arrest to arraignment satisfies this requirement, triggering consideration of the remaining *Barker* factors to determine the nature of the delay. These include the length and reason for the delay, whether the defendant has asserted his or her speedy trial rights, and the manner in which the delay prejudiced the defendant.[45] The *Barker* factors are not exclusive, and no individual factor is necessary or sufficient.[46]

██ ¶77 In assessing the reasons for the delay, a court considers, among other things, " 'whether the government or the criminal defendant is more to blame for th[e] delay.' "[47] "A defendant's claim that the government violated [his] right to a speedy trial is seriously undermined when

---

[42] 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *see also Iniguez*, 167 Wn.2d at 283-85.

[43] *Iniguez*, 167 Wn.2d at 283.

[44] *Iniguez*, 167 Wn.2d at 291-92.

[45] *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992); *Iniguez*, 167 Wn.2d at 283.

[46] *Iniguez*, 167 Wn.2d at 283.

[47] *Vermont v. Brillon*, 556 U.S. 81, 90, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) (alteration in original) (quoting *Doggett*, 505 U.S. at 651).

the defendant, and not the government, is the cause of the delay."[48]

¶78 The crux of the defendants' constitutional speedy trial argument is that the State caused the long delay by refusing to provide the death penalty assurances in a timely manner. But as with the defendants' essentially identical challenge under CrR 3.3, they fail to cite any authority suggesting that the State had an obligation to waive the potential application of the death penalty before Canadian extradition proceedings concluded. Nor have they alleged that anything within the State's control would have accelerated the Canadian extradition process. Under the circumstances, the defendants' resistance to extradition was the primary cause of the delay. Federal courts have uniformly rejected Sixth Amendment speedy trial claims where the trial delay arises from the defendant's resistance to formal extradition requests.[49]

¶79 The defendants have provided no meaningful analysis of the remaining *Barker* factors. The defendants made only minimal efforts to obtain a speedy trial. Rafay did not assert his right to a speedy trial until October 19, 1999, more than four years after the State filed the charges. Burns did not demand a speedy trial while in Canada. Instead, in April 2000 Burns informed the State that the

---

[48] *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988); *see also Brillon*, 556 U.S. at 90 (defendant's speedy trial rights not violated where delays were properly attributable to defense counsel).

[49] *See, e.g., United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995) (defendant cannot establish Sixth Amendment speedy trial violation "by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States"); *see also United States v. Mitchell*, 957 F.2d 465, 468-70 (7th Cir. 1992) (seven-year postindictment delay resulting from defendant's fugitive status and Colombian extradition process did not violate speedy trial right); *United States v. Thirion*, 813 F.2d 146, 154 (8th Cir. 1987) (absent evidence of any formal waiver of extradition, court unwilling to attribute to the government for speedy trial purposes any delay caused by formal extradition proceedings initiated in compliance with the treaty).

defendants would voluntarily appear for trial if the State agreed not to seek the death penalty.

¶80 In assessing the prejudice factor, a court looks to the effect of the delay on the interests protected by the right to a speedy trial, including preventing harsh pretrial incarceration, minimizing a defendant's anxiety and worry, and limiting impairment to the defense.[50] Because of the difficulty of proof, a defendant need not show actual impairment to establish a speedy trial violation, and a court will presume that such prejudice "intensifies over time."[51] Nonetheless, there will be a "stronger case" for a speedy trial violation if the defendant shows such prejudice.[52]

¶81 Here, the defendants rely solely on the presumption of prejudice and do not allege that the delay impaired their defense.[53] A claim of presumptive prejudice alone, without regard to the other *Barker* criteria, is insufficient to establish a Sixth Amendment violation.[54]

¶82 Although the length of the delay in this case was significant, a consideration of all of the factors in this case shows no constitutional speedy trial violation.

*Issue 3: Whether Defense Counsel's Decision To Inform the Jury that the Case Did Not Involve the Death Penalty Constituted Ineffective Assistance of Counsel*

¶83 Rafay and Burns contend that trial counsel provided constitutionally deficient assistance when they agreed that prospective jurors could be told the case did not involve the death penalty. They argue that this information likely made

---

[50] *Iniguez*, 167 Wn.2d at 295 (citing *Barker*, 407 U.S. at 532).

[51] *Iniguez*, 167 Wn.2d at 295 (citing *Doggett*, 505 U.S. at 652).

[52] *Iniguez*, 167 Wn.2d at 295.

[53] *See Iniguez*, 167 Wn.2d at 295.

[54] *Iniguez*, 167 Wn.2d at 283.

jurors less careful in their deliberations and more likely to convict. Therefore, counsel's deficient performance was sufficiently prejudicial to require reversal. Because we are confident that defendants' highly experienced trial counsel pursued a legitimate strategy, we conclude that their performance was not deficient.

¶84 To prevail on a claim of ineffective assistance, the defendant must show both (1) that the attorney's representation fell below an objective standard of reasonableness and (2) resulting prejudice, i.e., a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different.[55] "A failure to establish either element of the test defeats the ineffective assistance of counsel claim."[56] Our analysis begins with the "strong presumption that counsel's performance was reasonable."[57] To rebut this presumption, the defendant must show the absence of "any '*conceivable* legitimate tactic explaining counsel's performance.' "[58] " '[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' "[59] We review ineffective assistance claims de novo.[60]

¶85 On September 22, 2003, the parties discussed various procedures for conducting voir dire, including the upcoming deadline for the submission of proposed jury questionnaires. Based on the issuance of 3,000 summonses,

---

[55] *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

[56] *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

[57] *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

[58] *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

[59] *Grier*, 171 Wn.2d at 34 (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

[60] *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

the trial court planned to start voir dire with 300 potential jurors who would fill out the questionnaire. The appellate record does not disclose what discussions occurred during preparation of the questionnaire, but defendants' counsel eventually agreed to inclusion of the following language:

> Sebastian Burns and Atif Rafay are charged with three counts of aggravated first degree murder. The case involves the death of Mr. Rafay's father, mother, and sister in July 1994. Sebastian Burns and Atif Rafay have denied the allegations and have entered pleas of not guilty to the charges. This is not a death penalty case.[61]

¶86 During individual voir dire, which lasted about one month, defense counsel did not object when the absence of the death penalty was referred to in various contexts with more than 20 potential jurors who had indicated on the questionnaire that they were opposed to the death penalty or who otherwise raised the subject.[62]

¶87 Generally, in noncapital cases, the jury's sole function is to decide the defendant's guilt or innocence, and it should " 'reach its verdict without regard to what sentence might be imposed.' "[63] "Punishment is a question of legislative policy; the jury's function is to find the facts."[64] In

---

[61] The record indicates that the parties discussed the issue during an unrecorded conference call on September 23, 2003.

[62] As the State acknowledges, even though defense counsel agreed to inform the jury that the death penalty did not apply, the invited error doctrine does not preclude defendants' claim of ineffective assistance of counsel. *See State v. Aho*, 137 Wn.2d 736, 745, 975 P.2d 512 (1999).

[63] *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975)).

[64] *State v. Todd*, 78 Wn.2d 362, 375, 474 P.2d 542 (1970). The general concluding instruction reminds the jury of this function: "You have nothing whatever to do with any punishment that may be imposed in case of a violation of the law. You may not consider the fact that punishment may follow conviction except insofar as it may tend to make you careful." 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 1.02, at 14-15 (3d ed. 2008) (WPIC).

1997, in *State v. Murphy*,[65] this court noted that this has long been the rule in Washington and held that the trial court had erred by instructing potential jurors during voir dire that the case did not involve the death penalty.

¶88 In *State v. Townsend*,[66] our Supreme Court agreed with the general principles set forth in *Murphy* and held that "it is error to inform the jury during voir dire in a noncapital case that the case is not a death penalty case." The *Townsend* court concluded that defense counsel was constitutionally deficient for failing to object when the deputy prosecutor and the trial court advised the jury during voir dire that the case did not involve the death penalty. Consequently, in most cases, the trial court should respond to any mention of capital punishment by "stat[ing] generally that the jury is not to consider sentencing."[67]

¶89 Since *Townsend*, the Supreme Court has reaffirmed these general principles in both *State v. Mason*[68] and *State v. Hicks*.[69] But in *Mason*, the court acknowledged that there might be legitimate tactical reasons in a noncapital case to inform the jury that the case does not involve the death penalty:

> If this court was incorrect in *Townsend* then, upon a proper record, our decision should be challenged in a truly adversarial proceeding. If our reasoning was flawed in *Townsend*, and there are legitimate strategic and tactical reasons why informing a jury about issues of punishment would advance the interest of

---

[65] 86 Wn. App. 667, 670-71, 937 P.2d 1173 (1997).

[66] 142 Wn.2d 838, 840, 15 P.3d 145 (2001).

[67] *State v. Hicks*, 163 Wn.2d 477, 487, 181 P.3d 831 (2008).

[68] 160 Wn.2d 910, 929, 162 P.3d 396 (2007) (trial court erred in informing venire during voir dire that the death penalty was not implicated).

[69] 163 Wn.2d 477, 488, 181 P.3d 831 (2008) (defense counsel deficient for informing the jury that the case was noncapital and failing to object when the trial court and prosecution made similar references).

justice and provide a more fair trial, then counsel should zealously advance the arguments.[70]

The circumstances here supported such a strategy.

¶90 Both *Townsend* and *Murphy* were decided years before the defendants' trial. Although the appellate record does not disclose the precise basis for the parties' agreement about the death penalty advisement, we have no reason to doubt that the trial judge and counsel were familiar with and considered those decisions before drafting the juror questionnaire. Moreover, defense counsel objected when the deputy prosecutor apparently exceeded the scope of the parties' agreement by focusing his questioning of potential jurors on whether they were prepared to punish the defendants for the charged crimes.

¶91 The record and defense counsel's own questions during voir dire indicate that defense counsel agreed only to a carefully circumscribed disclosure that did not direct the jurors' attention to punishment in the case before them. Rather, defense counsel sought to ascertain whether potential jurors' views on the death penalty affected their ability to be fair in a case involving a very serious crime. The identification of jurors who would allow the potential punishment to affect their determination of guilt or innocence is a legitimate goal of voir dire.[71]

¶92 Nor was defense counsel's strategy to inform potential jurors about the death penalty based solely on assessing jurors in light of their general views about capital punishment. Counsel were also aware that potential jurors might be familiar with the facts surrounding the defendants' extradition, which included a long delay that ended when Washington State agreed to waive application of the

---

[70] *Mason*, 160 Wn.2d at 930; *see also Hicks*, 163 Wn.2d at 487 n.6.

[71] *Townsend*, 142 Wn.2d at 847.

death penalty, or to "plea bargain," as one potential juror characterized it, once Canadian legal proceedings concluded.

¶93 In light of the highly publicized circumstances surrounding defendants' extradition, counsel's decision to inform all potential jurors of the status of the death penalty arguably facilitated a more meaningful assessment of their knowledge of the case and the effect it might have on their ability to be impartial and open to the defense's theories of the case.

¶94 Finally, and perhaps most importantly, defense counsel's trial strategy included references to the death penalty in contexts not directly connected with the potential punishment in defendants' prosecution. Defense counsel faced the challenging circumstances that the jury would hear the defendants' confessions and damaging testimony from their close friend, Miyoshi. Counsel needed to give the jury reasons for the confessions and Miyoshi's decision to turn on his friends. During voir dire, counsel for Burns introduced the topic of false confessions. He told potential jurors about the Central Park jogger case and cited statistics showing that "20 of the 101 people freed from death row" were found innocent even though they had confessed. He discussed with them why an innocent person might confess to a serious crime and how one might recognize a false confession.

¶95 During trial, defense counsel again referred to the death penalty to undermine the credibility of two key State witnesses. During cross-examination of Detective Thompson, defense counsel pointed out seemingly careless mistakes in his 1995 affidavit, prepared at a time when the death penalty was still a possibility. During the pretrial-videotaped Miyoshi deposition, which was shown during trial, defense counsel pursued a similar strategy. He attempted to undermine Miyoshi's credibility by suggesting that he changed his initial denials of his friends' involve-

ment in the murders and incriminated Burns and Rafay in response to an RCMP officer's suggestion that Miyoshi might be subject to the death penalty along with the defendants. Defense counsel also pressed the same theory while questioning the RCMP officer during the defense's case in chief.

¶96 As the defendants correctly note, these additional references to the death penalty, as well as much of the questioning during voir dire, did not directly inform jurors of potential punishment in the current case. But experienced defense counsel could foresee a very real possibility that their strategic use of the death penalty in voir dire and the examination of witnesses might cause the trial court to advise the jury, at some point during trial, outside of their control, that the death penalty was not an issue in order to avoid confusion and speculation. This uncontrolled advice could come at a time or in a manner that implicitly undermined defense counsel's credibility with the jury. Given this possibility, defense counsel could reasonably have decided that the small chance of concealing the absence of the death penalty from jurors justified a brief statement informing all potential jurors of this fact at the very outset of the case as the best way to control the release of this information and preserve counsel's credibility. Given the nature of the defense, counsel certainly wanted to avoid any inference that counsel was attempting to mislead the jury about the severity of the punishment that the defendants faced.

¶97 Unlike *Townsend*, *Mason*, *Hicks*, and *Murphy*, which involved only brief references to the death penalty or defense counsel's half-hearted objection or complete failure to object, the record here indicates that defense counsel made a deliberate and considered legitimate and strategic choice to disclose to jurors the fact that the defendants were not subject to the death penalty. This decision conceivably facilitated not only the complex assessment of potential

jurors but also the pursuit of specific defense theories and objectives during trial.

¶98 We must presume that defense counsel were well aware of the concern that jurors who know the death penalty is not involved may be less attentive during trial and less likely to hold out in support of their views.[72] But defense counsel were in the best position to assess such concerns in light of their own voir dire and trial strategies. Counsel were also aware that the jury would be expressly instructed before deliberations that it was not to consider the fact that punishment may follow conviction "except insofar as it may tend to make you careful."[73] Given the complexity of the case, the highly publicized circumstances of the defendants' extradition, the defense theories and trial strategy, the possibility that the death penalty information would be disclosed in a manner outside of defense counsels' control, the potential confusion and speculation that could result from attempting to conceal the circumstances from potential and sitting jurors, and the effect that such confusion could have on the jurors' assessment of counsels' credibility, the decision by highly experienced defense counsel to agree to a limited advisement at the beginning of the case was reasonable and not deficient performance.

*Issue 4: Whether the Trial Court Erred in Excluding the Proposed Testimony by Richard Leo and Michael Levine on False Confessions and Undercover Operations*

¶99 Defendants contend that the trial court erred in excluding expert testimony from Richard Leo on false confessions and coercive police interrogation methods and from Michael Levine on undercover police practices. They argue that both witnesses were crucial to assisting the jury

---

[72] *See Townsend*, 142 Wn.2d at 846-47.

[73] 11 WPIC 1.02, at 14-15.

in understanding the psychological effects of the elaborate Project Estate scenarios that the RCMP employed to obtain their confessions. Because the reliability of their confessions was a central issue at trial, defendants maintain that exclusion of the expert testimony violated their constitutional right to present a complete defense.

### Richard Leo

¶100 On October 17, 2003, defendants moved to admit the testimony of Richard Leo. Leo, an associate professor of criminology and psychology at the University of California, had written and testified extensively on the topic of "false confessions."[74]

¶101 When the parties argued the motion on November 18, 2003, counsel for Burns informed the court that Leo would testify generally about the psychology of police interrogations, the phenomenon of false confessions, and "the erroneous but commonly held belief that people of normal mental capacity do not make untruthful and [inculpatory] statements." Counsel asserted that Leo would not opine on whether the confessions were false but would state that "if the confession in this case is false, he'll characterize it in one of the four groups that he's laid out from his research."

¶102 The State opposed the motion, asserting that in effect, Leo would be providing an improper opinion on the credibility of the witnesses. The State argued that the jury was fully capable of assessing the reliability of the defendants' confessions because they were videotaped and the video recordings would be played for the jury.

¶103 After extensive argument, the trial court excluded Leo's testimony, concluding,

---

[74] Leo is currently an associate professor of law at the University of San Francisco School of Law. He has continued to write prolifically on the subject since the trial in this case.

As I understand and has been presented to me, Dr. Leo is simply going to testify in a very global way, as [defense counsel] put it, that innocent people do give false confessions. Even normal people, not otherwise mentally disabled and so forth, will falsely confess to crimes.

It's the conclusion of this court that Dr. Leo's testimony is to be excluded. The rationale of the court is as follows:

It is in this court's opinion within the common experience of people of ordinary experience and knowledge that people for a variety of reasons, limited only by the human imagination, tell lies, little lies and big lies, and this jury was questioned during its selection of that very proposition and indicated they would not at all be surprised if people did tell lies.

Ultimately what Dr. Leo is testifying to would be testifying to—though he may say it in a different manner—that this was a coerced, compliant, false confession, and that is the final analysis and question for this jury to decide, number one, if it's a confession, and, number two, was it voluntary or was it coerced?

The trial court denied several subsequent motions for reconsideration.[75]

*Standard of Review*

¶104 ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The trial court necessarily has broad discretion in determining whether expert testimony should be admitted under ER 702, and we will reverse the

---

[75] In particular, the defense moved for reconsideration based on Al Haslett's testimony that Burns had passed up 12 opportunities to deny committing the crimes. Defendants argued that Haslett had opened the door to Leo's testimony that "the fact that there are no denials . . . says nothing about whether or not a confession is false." The trial court declined to reconsider the evidentiary ruling but precluded Haslett from opining on whether any particular response was a denial and from characterizing any response as an admission or confession.

trial court's evidentiary ruling only if it is based on unreasonable or untenable grounds.[76]

### Analysis under ER 702

■■■ ¶105 Admissibility under ER 702 depends on whether "(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact."[77] Only the third factor is at issue in this appeal.

■■■ ¶106 Defendants contend that Leo's testimony would have assisted the jury in understanding (1) the "counter-intuitive" phenomenon of false confessions; (2) the coercive interrogation techniques, including the "Reid" technique, that police use to obtain confessions;[78] and (3) the risk factors that are associated with false confessions. But a review of the defendants' limited offer of proof,[79] as well as Leo's published research, indicates that Leo's testimony about the risk factors of false confessions would have been highly speculative and would have provided the jury with scant assistance in evaluating the unusual facts of this case. Moreover, the alleged coercive factors encompassed concepts well within the general understanding of jurors. Under the circumstances, the trial court did not abuse its discretion in excluding Leo's testimony.[80]

---

[76] In re Det. of Anderson, 166 Wn.2d 543, 549, 211 P.3d 994 (2009).

[77] State v. Ciskie, 110 Wn.2d 263, 271, 751 P.2d 1165 (1988).

[78] See generally Richard A. Leo & Richard J. Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation, 88 J. Crim. L. & Criminology 429, 443 n.30 (1998).

[79] At the close of trial, the defense submitted Leo's affidavit as a formal offer of proof.

[80] Although Leo's work (and the related work of several other researchers) has been cited or discussed in both unpublished and published decisions in Washington, no published Washington appellate court decision has directly addressed the admissibility of such testimony under ER 702. See, e.g., In re Pers. Restraint of Bradford, 140 Wn. App. 124, 128, 165 P.3d 31 (2007) (at reference hearing regarding new DNA evidence undermining defendant's initial confession, refer-

¶107 At the time of the trial court's ruling, Leo's research and testimony rested almost exclusively on custodial police interrogations that resulted in confessions later determined to be false. The defendants' offer of proof did not explain how Leo would have addressed the fundamentally different circumstances of the noncustodial Project Estate, during which defendants repeatedly and voluntarily met with undercover officers over a period of several months and were free to come and go. As a recent article on the Canadian "Mr. Big" undercover operations concedes, "[I]t is not clear that the social science on police interrogations can be simply transferred to the context of Mr. Big investigations."[81] In their reply brief, defendants argue at length that the coercive interrogation techniques of custodial arrests apply equally to undercover operations and, in fact, may be even more coercive in that setting. But because Leo did not address these contentions in his offer of proof, we cannot ascertain what Leo would have said on this topic, the basis for his testimony, or whether it would have assisted the jury in assessing the reliability of the confessions.

¶108 Moreover, in his declaration, Leo expressly noted that he would be describing "the potential indicators of *known* unreliable admissions and confessions." (Emphasis added.) Leo has acknowledged that it is not currently possible even to estimate the incidence of police-coerced

---

ence hearing judge gave little or no weight to Leo's testimony that defendant's confession was unreliable but nonetheless found that DNA results would probably change the results of the trial); *In re Det. of Law*, 146 Wn. App. 28, 41, 204 P.3d 230 (2008) (trial court did not abuse its discretion in excluding Leo's testimony on false confessions once defendant denied making the alleged inculpatory statements); *see also State v. A.N.J.*, 168 Wn.2d 91, 110, 225 P.3d 956 (2010) ("False confessions (especially by children), mistaken eyewitness identifications, and the fallibility of child testimony are well documented." (citing Richard A. Leo et al., *Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century*, 2006 Wis. L. Rev. 479, 480-85; Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 904 (2004))).

[81] Timothy E. Moore et al., *Deceit, Betrayal and the Search for Truth: Legal and Psychological Perspectives on the "Mr. Big" Strategy*, 55 Crim. L. Q. 348, 351 (2009).

confessions or the number of resulting wrongful convictions.[82] But it is undisputed that such confessions represent a minuscule sampling of all confessions.[83] A 2010 article refers to a 2004 study examining "125 proven false confessions" as the most comprehensive to date.[84] False confessions, in turn, are implicated in only some of the known false convictions.[85] In a 1998 article, Leo analyzed 60 alleged false confessions, fewer than half of which involved defendants who were actually convicted on the basis of the false confession, and Leo expressly acknowledged that the cases "do not constitute a statistically adequate sample."[86]

¶109 More fundamentally, the record before the trial court was silent as to any specific correlation—statistical or otherwise—between coercive interrogation methods and the likelihood of an unreliable or false confession in any particular case. Leo acknowledges that the same coercive interrogation methods that lead to false confessions also produce true confessions. And he does not claim an ability to estimate the percentage of confessions that are false or to identify specific interrogation techniques, either individually or in combination, that are more likely to result in false confessions than in true confessions. Finally, Leo has not developed any methodology based on his research that

---

[82] Richard A. Leo & Richard J. Ofshe, *Using the Innocent To Scapegoat* Miranda: *Another Reply to Paul Cassell*, 88 J. Crim. L. & Criminology 557, 560 (1998). The authors of a recent article raising concerns about false confessions and the Canadian "Mr. Big" operations were not aware of "any proven case of a wrongful conviction involving a Mr. Big confession." Moore et al. at 350 n.11.

[83] In its amicus brief, the Innocence Network states that it has documented "56 convictions involving false confessions."

[84] Mark Costanzo et al., *Juror Beliefs About Police Interrogations, False Confessions, and Expert Testimony*, 7 J. Empirical Legal Stud. 231, 231-32 (2010).

[85] "There are now over 170 DNA exonerations of convictions, approximately 20 to 25 percent of which resulted in whole or in part from police-induced false confessions." Leo et al., 2006 Wis. L. Rev. at 484.

[86] Leo & Ofshe, 88 J. Crim. L. & Criminology at 435-36.

could assist in assessing the reliability of a particular confession.[87]

¶110 Defendants rely heavily on several cases in which the courts permitted expert testimony on the risk of false confessions. Each of these cases involved specific personality or mental attributes that rendered the defendant particularly vulnerable to coercive interrogation methods, including mental deficiency,[88] personality disorder,[89] debilitation resulting from extended drinking,[90] severe language disorder,[91] recognized mental disorder,[92] and low IQ (intelligence quotient).[93] Defendants do not allege that Leo would have offered any insight into specific traits of the defendants that would have made them more susceptible to false confessions.

¶111 We find instructive Leo's offer of proof in *Vent v. State*,[94] decided shortly before defendants' trial. In *Vent*, the court upheld the exclusion of Leo's testimony in part because of concerns about whether the testimony would appreciably aid the jury. During an extensive examination outside the presence of the jury, Leo described his proposed testimony in terms similar to his offer of proof here,

---

[87] Leo has generally acknowledged that the only way to assess the reliability of a particular confession is to compare it with the other facts and evidence developed at trial.

[88] *Miller v. State*, 770 N.E.2d 763, 774 (Ind. 2002) ("the general substance of Dr. Ofshe's testimony would have assisted the jury regarding the psychology of relevant aspects of police interrogation and the interrogation of mentally retarded persons, topics outside common knowledge and experience").

[89] *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) (Ofshe's testimony admissible where psychologist would have testified about defendant's personality disorder that made him more susceptible to psychological coercion).

[90] *Boyer v. State*, 825 So. 2d 418 (Fla. Dist. Ct. App. 2002).

[91] *United States v. Vallejo*, 237 F.3d 1008 (9th Cir. 2001).

[92] *United States v. Shay*, 57 F.3d 126, 133-34 (1st Cir. 1995) (mental disorder causing defendant to make false statements).

[93] *Hannon v. State*, 2004 WY 8, 84 P.3d 320, 353.

[94] 67 P.3d 661 (Alaska Ct. App. 2003).

indicating that he wished to dispel the common belief that people do not make unreliable or false statements unless they are tortured or mentally ill:

> "Sometimes, people do make false statements, even if they're not physically tortured or mentally ill. . . . There is psychological research that explains how certain [interrogation] techniques can lead people to make the decision to confess, whether they're guilty or innocent. And . . . there are certain principles of analysis that researchers use to evaluate whether or not a statement is likely reliable or likely unreliable."[95]

Leo explained that in testing the reliability of confessions, researchers generally examine how the confession fits the facts of the crime and demonstrates that the defendant had actual knowledge.

¶112 Leo described his expertise as involving the identification of the techniques that interrogators generally employ to convince suspects to confess but acknowledged that he had no opinion as to whether these techniques led to truthful or false confessions:

> "*Dr. Leo*: Even if an interrogation is [overtly] coercive, it still could produce a true confession. And so one can't infer from the [interrogative] techniques that are used, . . . proper or improper, whether or not the confession is false. The only way to do [that] is to objectively analyze whether the suspect demonstrates actual knowledge [of the crime] and how [the suspect's narrative] fits with the record or doesn't fit with the record."[96]

¶113 At trial, Burns testified that after careful planning, he and Rafay intentionally and falsely confessed to the murder of Rafay's parents and sister out of fear that Haslett and Shinkaruk might kill them. As the trial court suggested, the notion that someone might lie out of fear of

---

[95] *Vent*, 67 P.3d at 671 (alterations in original).

[96] *Vent*, 67 P.3d at 671 (alterations in original).

being killed, to avoid prosecution for a serious crime, or in exchange for financial gain, are all concepts well within the commonsense understanding of jurors.[97] Assessing the reliability of a confession by comparing it with the other facts alleged during the trial falls directly within the jury's obligations to determine facts and assess the credibility of witnesses. And as Leo and others have repeatedly recommended, the confessions here were videotaped and played for the jury, allowing the jury to make a more informed assessment of reliability.[98]

¶114 In sum, Leo was unable to testify about any meaningful correlation between specific interrogation methods and false confessions or provide any method for the trier of fact to analyze the effect of the general concepts on the reliability of the defendants' confessions. Given the defendants' alleged basis for their false confessions, such limitations rendered Leo's proposed testimony potentially confusing and misleading.[99] Viewed in context, Leo's proposed testimony that if the confessions were false, they were

---

[97] *See, e.g.*, *People v. Gilliam*, 172 Ill. 2d 484, 513, 670 N.E.2d 606, 218 Ill. Dec. 884 (1996) (whether defendant falsely confessed to protect his family "is not a concept beyond the understanding of ordinary citizens, and is not difficult to understand or explain").

[98]
> The risk of harm caused by false confessions could be greatly reduced if police were required to video- or audio-record the entirety of their interrogations. . . . The practice of recording creates an objective and exact record of the interrogation process that all parties—police, prosecutors, defense attorneys, judges, juries—can review at any time. The existence of an exact record of the interrogation is crucial for determining the voluntariness and reliability of any confession statement, especially if the confession is internally inconsistent, is contradicted by some of the case facts, or was elicited by coercive methods or from highly suggestible individuals.

Leo & Ofshe, 88 J. Crim. L. & Criminology at 494.

[99] *See People v. Polk*, 407 Ill. App. 3d 80, 103, 942 N.E.2d 44, 347 Ill. Dec. 211 (2010) (Leo's proposed testimony that defendant's low IQ and police interrogation techniques "could have resulted in a false confession" was not beyond understanding of ordinary citizens), *review denied*, 949 N.E.2d 1102, 351 Ill. Dec. 7 (2011), *cert. denied*, 132 S. Ct. 1793 (2012).

coerced-compliant confessions[100] clearly implies an opinion that the confessions were unreliable.

¶115 Under the circumstances, the trial court's determination that Leo's proposed testimony would not be helpful and would invade the province of the jury was at least debatable. The trial court's exclusion of the proposed testimony was therefore not an abuse of discretion.[101]

¶116 Defendants also claim that Leo's testimony was necessary to rebut RCMP witnesses expressing their belief that the defendants were telling the truth when they confessed. But this contention apparently refers exclusively to testimony defense counsel brought out, with essentially no objection, during cross-examination. Defendants have not presented any persuasive argument suggesting that the proposed expert testimony was admissible to rebut evidence elicited in this manner.

¶117 Finally, defendants contend that Leo's testimony would have assisted the jury in assessing the reliability of Miyoshi's deposition, and the State argues that Leo did not base his testimony on accepted scientific principles.[102] Because the parties raise both of these claims for the first time on appeal, we decline to address them.[103]

*Michael Levine*

¶118 Defendants contend the trial court erred in excluding expert testimony by Michael Levine, a former Drug Enforcement Administration undercover specialist. Among

---

[100] In a reply brief, defendants suggest that defense counsel's letter setting forth this conditional opinion was not before the trial court. But defense counsel's comments during oral argument and the trial court's reference to coerced-compliant confession in its oral decision indicate otherwise.

[101] *See State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

[102] *See Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (1923); *State v. Free*, 351 N.J. Super. 203, 220, 798 A.2d 83 (Ct. App. Div. 2002) (concluding that evidence did not establish testimony of Dr. Kassin on general police environment and susceptibility to false confessions was scientifically reliable).

[103] *See State v. Kirkpatrick*, 160 Wn.2d 873, 879-80, 161 P.3d 990 (2007); RAP 2.5(a).

other things, Levine would have testified that the RCMP's undercover operation failed to meet United States professional standards and that Project Estate's omissions and mistakes resulted in a high likelihood that the confessions were unreliable or false.

¶119 Levine's proposed testimony was set forth primarily in a detailed "witness summary," submitted on October 10, 2003. In 20 detailed "findings," Levine identified deficiencies of Project Estate that allegedly violated United States "standards and norms." These included (1) the use of an elaborate reverse sting operation designed for career criminals, with bait involving money, appealing life-style, sexy women and flashy cars, intimidation, and implied threats of violence against immature teenage targets; (2) the operation's failure to examine, despite repeated opportunities and danger signs, the possibility of entrapment and involuntary confessions; (3) the intentional avoidance of or failure to investigate the targets' statements that were inconsistent with guilt; (4) an excessive reliance on providing the targets with false information; (5) the operatives' own consumption of alcohol and their coercive attempts to convince the targets to consume alcohol against their desires; (6) the failure of the undercover operations to glean any true "holdback" information; and (7) the immediate focus of both Canadian and United States police on Burns and Rafay and their failure to investigate "other leads and basic investigative steps." As indicated, Levine directed his criticism to both the RCMP undercover operation and the overall police investigation.

¶120 Based on the poorly designed and executed undercover plan and targets repeatedly described as unsophisticated, naïve, immature, and gullible, at least about criminal matters, Levine concluded that the operation "held a significant likelihood of eliciting false claims and/or braggadocio and/or involuntary statements and/or confessions." Levine provided a slightly modified affidavit, dated March

16, 2004, in support of Rafay's motion for reconsideration of the trial court's decision to exclude Levine's testimony.

¶121 Following lengthy argument, the trial court excluded Levine's proposed testimony. The court found no evidence of a generally accepted standard for undercover murder investigations in Canada or in the United States at the relevant time. The court also noted the absence of any apparent foundation for Levine's repeated assertions that the defendants were unsophisticated, immature, and naïve to the extent that the undercover operation likely rendered their confessions coerced or false. The court concluded that under the circumstances, as was the case with Leo's proposed testimony, the crux of the testimony would invade the province of the jury to assess the reliability of the confessions:

> Mr. Levine, a retired Department of Justice police officer, has been out of law enforcement for some 13 plus years, is offered to this court to come in—although he made 20 findings, there really are about three with which he restates it about five or six different ways, that the operation was poorly planned, poorly executed, did not meet U.S. standards, and that the confessions are false or coerced.

> I am excluding Mr. Levine's testimony. I have no doubt that Mr. Levine is a former law enforcement officer in drug enforcement, a current TV [television] and movie consultant, TV and movie personality and, apparently, someone with some experience as an expert witness in drug enforcement, money laundering and undercover operations, could no doubt entertain and inform this jury, as he's apparently done on Geraldo Rivera and Donahue shows in the past, but in the final analysis, what he does is simply, again, invade the province of this jury to decide whether or not in their common experience and common sense these statements made by these defendants to those undercover police officers are voluntary or involuntary, are accurate or—I think also one of the phrases they use, "or false bragging."

I would make this additional conclusion, which I think needs to be made to support this record for any court looking at it, and no doubt one will, or several, that in 1994 to 1995 there is no evidence in this record of a generally accepted standard for undercover operation investigations of murder in Canada, pursuant to the testimony of the Canadian officers this court has heard, and there is nothing in Mr. Levine's findings, so-called findings, to indicate that there were generally accepted standards for undercover operations in '94 and '95 in the United States.

If this court is misreading Mr. Levine's very loquacious findings, in fact, failing to read between the lines, he is telling me there are those standards or were those standards in '94 and '95 in the United States, they do not, this court concludes, have any application to Canadian police law enforcement in '94 and '95.

Additionally, Mr. Levine is rejected by this court, for there is simply no basis for Mr. Levine to characterize the defendants in 1995 [as] unsophisticated, naive, immature, innocent, and gullible.

Mr. Levine presents himself in this manner virtually in the guise of a clinical psychologist without any training or credentials.

It is in the final analysis the province of the jury to decide credibility of the statements of the defense. I guess I am repeating myself. Additionally, Mr. Levine lacks a complete view of the file when he opines findings 15 and 16, that there is no evidence to corroborate motive/sharing of financial gain and no evidence to corroborate the confessions or statements by the defendants.

For all of these reasons Mr. Levine's, I am sure, very entertaining testimony is being rejected.

The court later denied several motions for reconsideration.

¶122 On appeal, the defendants contend that Levine's testimony was necessary to establish that the flaws in the RCMP undercover operation, including its failure to follow

United States standards governing such operations, created a strong likelihood that the defendants' statements were false bragging and unreliable. Defendants also maintain that the trial court's ruling was premised on the erroneous belief that Levine would testify that the confessions were false.

¶123 Based on his extensive "findings," Levine's proposed testimony clearly suggested his belief that the confessions were false. But as the trial court noted, the foundation for many of those conclusory findings is difficult to ascertain. Nor did Levine explain adequately his understanding of Canadian undercover investigation standards.

¶124 Levine clearly had significant experience with various undercover operations. But as defendants concede, there were no formal standards governing RCMP undercover operations in 1995. And as the trial court indicated, even if Levine could have testified about the standards governing United States undercover operations in 1995, those standards would be relevant only if there was evidence to support Levine's claim that the RCMP's failure to follow comparable standards resulted in a "high likelihood" that the confessions were false or unreliable. Levine's offer of proof is completely silent about the foundation for this claim.[104] Without such a foundation, Levine's proposed testimony about the inadequate undercover investigation and its coercive effects on the defendants would have been of no assistance to the jury. Based on the record before it, the trial court did not abuse its discretion in excluding Levine's testimony.

### Constitutional Right To Present a Defense

¶125 "A defendant in a criminal case has a constitutional right to present a defense consisting of relevant

---

[104] The trial court indicated a willingness to consider a *Frye* hearing, but neither party pursued that possibility.

evidence that is not otherwise inadmissible."[105] But " 'a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense.' "[106]

¶126 Defendants rely primarily on the United States Supreme Court's decision in *Crane v. Kentucky*.[107] In *Crane*, the 16-year-old defendant argued that police had coerced a false confession from him. After concluding that the confession was voluntary, the trial court ruled that evidence of the circumstances surrounding the confession was relevant only to voluntariness and therefore inadmissible at trial.

¶127 The Supreme Court reversed, noting that voluntariness and reliability are two separate issues and that evidence about the manner in which a confession is obtained is relevant to both credibility and voluntariness. The Court concluded that the "blanket exclusion" of evidence relating to the circumstances surrounding the confession deprived the defendant of a fair opportunity to present a defense:

> [If the defendant is] stripped of the power to describe to the jury the circumstances that prompted his confession, [he] is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?[108]

But the Court stressed that the trial court retains " 'wide latitude' " to exclude repetitive, marginally relevant, or confusing evidence.[109]

---

[105] *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992).

[106] *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004) (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)).

[107] 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

[108] *Crane*, 476 U.S. at 690, 689.

[109] *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)); *see also Montana v. Egelhoff*, 518 U.S. 37, 53, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996).

¶128 Here, unlike *Crane*, the trial court's ruling excluding the testimony of Leo and Levine did not involve a "blanket exclusion" of all evidence of the circumstances surrounding the confessions. Defense counsel had broad latitude to explore the circumstances surrounding the confessions, including cross-examination of the State's witnesses about their participation in the Project Estate scenarios, their methods of interrogation, and their actions regarding both defendants. Moreover, as already indicated, jurors had an unparalleled opportunity to assess the circumstances surrounding the confessions, including video recordings of the confessions and many hours of audio recordings documenting the defendants' interactions with the undercover agents as well as their private conversations. The Supreme Court has repeatedly emphasized that the mere fact an evidentiary rule may reasonably exclude favorable evidence does not necessarily restrict the defendant from presenting a defense.[110] Evidentiary rules impermissibly abridge a criminal defendant's right to present a defense only if they are " 'arbitrary' or 'disproportionate' " and "infringe[ ] upon a weighty interest of the accused."[111] The Supreme Court has generally found such an abridgment only when the evidentiary ruling effectively prohibited the substantive testimony of the defendant on matters relevant to the defense or the testimony of a percipient witness.[112]

---

[110] *See United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998).

[111] *Scheffer*, 523 U.S. at 308 (absolute bar on admission of exculpatory polygraph test did not impermissibly abridge defendant's right to present a defense) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)).

[112] *See, e.g., Rock*, 483 U.S. at 62 (trial court ruling barring all of the defendant's hypnotically refreshed testimony violated defendant's right to present a defense); *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (evidentiary rule barring testimony of codefendants denied defendant the right to present testimony of percipient witness); *see also Crane*, 476 U.S. at 691 (defendant denied opportunity to describe for the jury the circumstances that caused his confession); *Chambers v. Mississippi*, 410 U.S. 284, 297-98, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (exclusion of adverse witness's confessions).

¶129 Given the limited scope of the proposed expert testimony, the trial court's ruling did not significantly restrict the defendants' ability to present evidence of the circumstances surrounding the confessions or unfairly restrict their ability to present a meaningful defense.

*Issue 5: Whether the Trial Court's Exclusion and Limitation of "Other Suspect" Evidence Violated the Defendants' Right To Present a Defense*

¶130 Defendants contend that the trial court violated their constitutional right to present a defense by improperly limiting the admission of "other suspect" evidence. They argue that the excluded evidence of militant and radical Muslim groups was admissible both to establish the existence of another perpetrator and to impeach the adequacy of the Bellevue Police Department's investigation. But the trial court properly excluded the proposed evidence because it was too speculative to establish a nexus between other possible suspects and the Rafay murders. The trial court admitted other suspect evidence sufficient to permit the defendants to challenge the adequacy of the police investigation. Consequently, the evidentiary rulings did not violate the defendants' right to present a defense.

¶131 Before trial, the State moved to exclude the following three sources of alleged other suspect evidence.

*Douglas Mohammed*

¶132 Several days after the murder, Douglas Mohammed, an FBI informant who had apparently provided "useful" information in the past, contacted the Bellevue Police Department and indicated he might have information relating to the Rafay murders. On the afternoon of July 18, 1994, Mohammed met with Detective Thompson and Detective Gomes. Mohammed identified an individual he characterized as the head of a local violent Muslim faction and claimed that the man "had indicated that Tariq Rafay

should be killed because of [his] interpretation of the Koran."

¶133 Mohammed told the detectives that on the Friday after the murders, one of the men belonging to the local faction came to Mohammed's house. The man, who appeared to be nervous and frightened, asked Mohammed if he had seen a baseball bat that members of the group had been carrying around. Mohammed had heard that the Rafay family was bludgeoned to death. He thought there might be a connection between the bat and the murders. His reference to a bat came at a point in the investigation when police had not yet publicly identified the possible murder weapon.

¶134 Detective Thompson thought Mohammed was "crazy" and not credible based in part on his demeanor, noting that Mohammed had "rambled on" and had identified "dozens of people, license numbers and telephone numbers of all sorts of people who might be involved in killing Mr. Rafay." Bellevue police spoke with Tariq's relatives and acquaintances, who reported that he was not a leader in his Muslim community and not involved in any religious conflicts. Nor were the Bellevue police aware of any violence in the local Muslim community. Because they found no indication that the murders were connected with a religious conflict or dispute, Bellevue police did not pursue Mohammed's information.

### FUQRA

¶135 Several weeks after the murders, Seattle Police Detective Detmar contacted the Bellevue Police Department and said that an Islamic terrorist group known as "FUQRA" was "possibly associated" with the murders. According to Bellevue Police Officer Schneider,

> [Detmar said FUQRA] are based out of Toronto, and that they target Muslims who do not practice the faith or interpret the

"Koran" as they do. Det[ective] Detmar said that they punish these unfaithful persons by bombing, stabbing, and murdering them. He said that this group is very organized and they do contract assassinations [and] never take credit openly for its actions. . . . He elaborated by saying that on 8/1/84 there were four incidents associated with this "FUQRA" group and they included the bombing of the Seattle Trade Center, bombing in Denver, kidnapping in Kansas, [and] triple homicide in Tacoma.

Bellevue police officers did not investigate the tip.

### Jesse Brar & the Dosanjh Group

¶136 On July 19, 1994, a confidential informant contacted RCMP Constable Patrice Gelinas and said he had learned from another source that a week and a half before, the Dosanjh group, a Vancouver organized crime family, had placed a contract on an East Indian family living in Bellevue that had formerly lived in Vancouver, B.C. Gelinas's source also learned that Jesse Brar had been offered $20,000 to carry out the contract, but the source had no personal knowledge about the murders.

¶137 Bellevue detectives unsuccessfully tried to contact Brar on several occasions. They never discovered a link between the Rafay family and organized crime. Years later, the detectives learned that Jesse Brar was the informant's source for the tip to Gelinas.

¶138 The defense argued that all three tips were admissible both as other suspect evidence and to impeach the thoroughness of the State's investigation. The trial court admitted evidence pertaining to the Dosanjh and Jesse Brar tip but excluded any reference to the Mohammed and FUQRA information.

¶139 A criminal defendant's constitutional right to present a defense " 'is, in essence, the right to a fair opportunity to defend against the State's accusations' " and includes the

right to offer testimony and examine witnesses.[113] But that right is not absolute and does not guarantee the admission of irrelevant or otherwise inadmissible evidence.[114]

¶140 Washington has long followed the rule that before a defendant may present evidence suggesting another person committed the charged offense, the defendant must first establish a sufficient foundation, including " 'a train of facts or circumstances as tend clearly to point out' " someone besides the defendant as the guilty party.[115] The requisite foundation requires a clear nexus between the other person and the crime.[116] The proposed testimony must show a "step taken by the third party that indicates an intention to act" on the motive or opportunity.[117] We review the trial court's decision to exclude other suspect evidence for an abuse of discretion.[118] We review de novo an alleged violation of a criminal defendant's right to present a defense.[119]

¶141 The Mohammed and FUQRA tips rested primarily on the alleged existence of "violent" Muslim groups with ill-defined motives. Mohammed identified certain individuals belonging to a local violent Muslim faction, attributed to one of them a statement that Tariq should be killed because of his interpretation of the Koran, and said another member of the group had nervously mentioned a bat shortly after the murders. But he did not provide any information that

---

[113] *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers*, 410 U.S. at 294).

[114] *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); *State v. Maupin*, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996).

[115] *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932) (quoting *Greenfield v. People*, 85 N.Y. 75, 89 (1881)).

[116] *State v. Condon*, 72 Wn. App. 638, 647, 865 P.2d 521 (1993).

[117] *Rehak*, 67 Wn. App. at 163.

[118] *Thomas*, 150 Wn.2d at 856-61.

[119] *Jones*, 168 Wn.2d at 719.

placed someone near the murder scene, indicated that someone had acted on the possible motive, or that linked any other individual or group member to the murder. Indeed, Mohammed supplied the names of "dozens" of possible suspects.

¶142 The FUQRA tip was even more speculative. The actions described in the tip occurred in 1984, some 10 years earlier. Nothing in the tip linked FUQRA to the murders or even to the local Muslim group that Mohammed identified. Such evidence is accurately characterized as "the most remote kind of speculation."[120]

¶143 The defendants' reliance on alleged religious disputes that might have endangered Tariq's life is equally misplaced. In his statement to police on July 14, 1994, Rafay recalled that his mother had mentioned "enemies of the family and whatever[,] another religious group, Shi-ites and stuff," but he was unable to provide details about conflicts involving his family, religious or otherwise. Friends and acquaintances were unaware of Tariq's involvement in any religious or doctrinal dispute. Tahir Rafay, Tariq's brother, testified that Tariq had published an article explaining why the direction of Muslim prayer in North America had to be changed from southeast to northeast to account for the curvature of the earth. Tahir explained that there was "some resistance" to the change but that the resistance was "not violent in any way. It was just disagreement." Others also disseminated the information, and it had appeared in the newspapers before Tariq published his article.

¶144 The Mohammed and FUQRA tips failed to establish any meaningful nexus between the alleged violent Muslim factions and the Rafay murders. The "[m]ere evidence of motive in another party, or motive coupled with

---

[120] *Downs*, 168 Wash. at 668.

threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged."[121] The other suspect evidence here was far more speculative than that which courts have found sufficient to satisfy the necessary foundation. For example, in *State v. Maupin*,[122] the court held that evidence of an eyewitness who placed the kidnapping victim in the company of someone other than the defendant on the day after the kidnapping pointed directly to someone else as the guilty party and therefore satisfied the foundation for other suspect evidence. Under the circumstances, the trial court did not abuse its discretion in excluding the Mohammed and FUQRA tips as other suspect evidence.

¶145 Defendants suggest that Washington's foundational restrictions on other suspect evidence are unconstitutional, citing *Holmes v. South Carolina*.[123] In *Holmes*, the Court addressed a South Carolina rule allowing the exclusion of third party suspect evidence when the evidence against the defendant was strong, "even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues."[124] But the *Holmes* Court noted its approval of state rules limiting other suspect evidence, including the rule in Washington, when the evidence was speculative or remote or did not tend to prove or disprove a material fact.[125] *Holmes* therefore does

---

[121] *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933), *quoted with approval in State v. Russell*, 125 Wn.2d 24, 77, 882 P.2d 747 (1994) and *Maupin*, 128 Wn.2d at 927.

[122] 128 Wn.2d 918, 928, 913 P.2d 808 (1996); *see also State v. Clark*, 78 Wn. App. 471, 479-80, 898 P.2d 854 (1995) (other arson suspect had motive, opportunity, and ability to commit the charged arson and had previously bragged about his knowledge about arson and threatened to set former wife's house on fire).

[123] 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).

[124] *Holmes*, 547 U.S. at 329.

[125] *Holmes*, 547 U.S. at 327.

not support the claim that Washington's other suspect limitation is unconstitutional.[126]

¶146 Burns and Rafay next contend that the Mohammed and FUQRA tips were independently admissible for purposes of impeaching the thoroughness of the Bellevue police investigation. They argue that the evidence would have tended to rebut the impression of thoroughness that the State created through the admission of massive and "tedious" evidence of blood drops, hairs, and fingerprints. The trial court excluded the Mohammed and FUQRA tips for impeachment purposes as well, concluding that it was merely an effort to bring the other suspect evidence in through the "back door."

¶147 Evidence of sloppy police work in gathering physical evidence, such as fingerprints and DNA samples, or in establishing chain of custody generally is relevant and admissible. But as the State notes, the defense fully cross-examined all of the State's witnesses about the thoroughness of their investigation of the murder scene. In some circumstances, the failure to investigate other suspect evidence may also be admissible to support the defendant's theory that someone else committed the crime.[127] Here, the trial court admitted evidence of the Dosanjh and Jesse Brar tips and permitted defense counsel to cross-examine detectives about their efforts to discover whether any religious dispute might have led to the murders.[128]

---

[126] This court recently rejected an essentially identical claim in *State v. Strizheus*, 163 Wn. App. 820, 833-35, 262 P.3d 100 (2011), *review denied*, 173 Wn.2d 1030 (2012).

[127] *See United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (trial court erroneously excluded evidence of adequacy of police investigation where there was strong direct evidence that victim's husband committed the crime).

[128] Defendants contend that the trial court impermissibly limited the admission of evidence of the Dosanjh and Jesse Brar tips. But because they devote no legal argument to this contention, we decline to address it. *See* RAP 10.3(a)(6); *Thomas*, 150 Wn.2d at 868-69.

¶148 But for the reasons set forth above, the Mohammed and FUQRA tips failed to support the slightest inference that another perpetrator committed the Rafay murders. The trial court properly excluded the evidence for a lack of foundation. Cross-examination on the failure to investigate these tips therefore had no potential to support the defendants' claim that someone else committed the crime or to undermine any specific aspect of the State's case against the defendants. Moreover, speculative cross-examination in such circumstances could have unfairly shifted the focus from the State's accusations against the defendants to accusations against the police.[129] The trial court did not abuse its discretion in excluding the Mohammed and FUQRA tips for impeachment purposes.[130]

*Issue 6: Comment on Guilt and Denial of Mistrial*

¶149 Burns and Rafay contend that several Bellevue police officers and other State witnesses expressed improper opinions on their guilt or veracity and violated the trial court's in limine orders. They argue that this repeated, flagrant misconduct violated their right to a fair trial and that the trial court should have granted their motion for a mistrial.

¶150 In each case, however, the trial court promptly sustained the defense objection and either struck the challenged comment or directed the jury to disregard it. The potential prejudice resulting from the comments was in most instances minimal. And in any event, the comments were not so egregious, either individually or cumulatively,

---

[129] *See United States v. Patrick*, 248 F.3d 11, 22-23 (1st Cir. 2001) (evidence of police failure to investigate other suspects was prejudicial and irrelevant when there was no indication that further investigation would have suggested the guilt of another person).

[130] *See Rehak*, 67 Wn. App. at 163-64 (trial court properly excluded evidence of police response to tip about third party perpetrator where tip lacked proper foundation to admit as other suspect evidence).

that the curative instructions could not have negated the potential prejudice. We find nothing in the record to overcome the presumption that the jury followed the curative instructions. The trial court therefore did not abuse its discretion in denying the defendants' motion for a mistrial.

¶151 Before trial, the defense moved to limit the extent to which Bellevue police officers could describe their impressions of the defendants after the murders. The State maintained that the officers could testify about their observations and their "surprise" when the defendants appeared to show no emotion after the "carnage" they had witnessed. Defense counsel conceded the officers could describe the defendants' demeanor but argued the officers could not go beyond those observations.

¶152 The trial court granted the defense's motion in part, concluding that the officers would be permitted to describe the defendants' demeanor, if it was based on factual observations, but that "[w]hen an officer testifies that some reaction or some conduct was very odd, that's an opinion and it's going to be excluded." The court acknowledged that the dividing line between acceptable and unacceptable testimony is not always clear.

### Comments on Guilt or Veracity

¶153 Generally, no witness may offer testimony in the form of an opinion regarding the defendant's guilt or veracity.[131] This testimony unfairly prejudices the defendant because it invades the exclusive province of the jury to make an independent determination of the relevant facts.[132] To determine whether a statement constitutes improper opinion testimony, a court considers the type of witness, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of

---

[131] *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001).

[132] *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

fact.[133] The improper testimony of a police officer raises additional concerns because "an officer's testimony often carries a special aura of reliability."[134] But testimony that is based on inferences from the evidence, does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury does not generally constitute an opinion on guilt.[135]

¶154 The defendants first challenge single, brief comments by three Bellevue police officers who responded to the 911 call and observed the defendants outside the Rafay home: Greg Neese, Lisa Piculell, and Stephen Cercone.

### Greg Neese

¶155 After taking photographs inside the house and placing crime scene tape, Officer Neese parked near the entrance to the cul-de-sac and prepared his report. In a lengthy response to a question about where he had last seen Burns at the crime scene, Neese eventually explained that he looked over and saw Burns being transported in a police vehicle, apparently to the station. In a nonresponsive comment, Neese added that Burns gave him "what I call, 'the grin' . . . kind of a wry smile, and it kind of shocked me." At this point, defense counsel objected that the question was "asked and answered." The trial court agreed: "The response that it shocked me will be stricken. The jury is instructed to disregard it. The balance of the answer will stand."

### Lisa Piculell

¶156 Officer Piculell arrived at the Rafay residence shortly after 2:00 a.m. and was told to "take care" of Burns and Rafay, who were sitting together on a curb, facing the house. Piculell approached the defendants, hoping to be

---

[133] *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008).

[134] *Kirkman*, 159 Wn.2d at 928.

[135] *See City of Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993).

"empathetic" because of what she believed they had seen in the house.

¶157 Piculell first ascertained that Burns, who was "clutching his stomach" and seemed to be in severe pain, did not need medical aid. She then approached Rafay, whose demeanor she characterized as "just staring straight ahead, pretty motionless, just focused straight ahead, staring."

¶158 When asked again about her observations of Rafay's demeanor, Piculell replied, "He seemed somewhat robotic." Defense counsel objected "as to characterizations." The trial court sustained the objection and asked the witness to try to describe what she saw in words. Piculell then explained, without objection, that Rafay "made eye contact with me. He answered the questions directly, without elaboration, and he seemed—and he was smoking as he was doing that."

*Stephen Cercone*

¶159 Officer Cercone arrived at the Rafay home shortly after 2:00 a.m. After performing several tasks, he observed Burns and Rafay talking to officers. Burns initially appeared "very emotional and flushed" and Rafay was "very calm." Later, Cercone approached Rafay, expressed his sympathy, and advised Rafay that he would have to go to the station in a short while to talk in more detail to the investigating detectives.

¶160 Without objection, Cercone testified that Rafay seemed "startled" and said several times, " 'Why do we have to go down to the station?' " When Cercone later added that Rafay seemed "surprised and very concerned," defense counsel objected. The trial court sustained the objection and ordered that the reference to "concerned" be stricken.

¶161 Testimony that Burns's grin "kind of shocked" an officer and that Rafay appeared "robotic" and "very con-

cerned" cannot reasonably be construed as direct comments on the guilt or veracity of the defendants. Rather, the comments were primarily an attempt to describe the defendants' demeanor. Washington courts have repeatedly found comparable comments admissible when based on a proper foundation of factual observations that directly and logically support the witness's conclusion.[136] The officers here testified, without objection, in considerable detail about their observations of the defendants' demeanor. When viewed in context, the jury would likely have viewed the comments as a reference to the defendants' behavior rather than as an indirect opinion on guilt or veracity.[137] And in any event, the challenged comments were brief and isolated, and the trial court immediately directed the jury to disregard them. Under the circumstances, the curative instruction was sufficient to remedy any potential prejudice.

### Jeffrey Gomes

¶162 The defendants challenge several comments by Bellevue Police Detective Jeffrey Gomes. Gomes testified that he had spoken several times with Rafay on July 13 and July 14 and urged him to contact remaining family members about funeral arrangements. Rafay repeatedly rejected this advice. When Gomes pressed Rafay to call an uncle and ask for help in contacting remaining family members, Rafay responded, " 'Who the fuck are you to tell me how I should

---

[136] See, e.g., State v. Stenson, 132 Wn.2d 668, 724, 940 P.2d 1239 (1997) (testimony by paramedic that he was "surprise[d]" at learning that defendant was victim's husband was not improper when based on personal observations); State v. Day, 51 Wn. App. 544, 552, 754 P.2d 1021 (1988) (opinion testimony of defendant's reaction is admissible when based on proper foundation of factual observations that directly support the conclusion); State v. Craven, 69 Wn. App. 581, 585, 849 P.2d 681 (1993) (emergency room worker properly testified that defendant's behavior was unusual); State v. Allen, 50 Wn. App. 412, 416, 749 P.2d 702 (1988) (police officer properly testified that defendant's sobbing " 'did not look genuine or sincere' ").

[137] See State v. Hager, 171 Wn.2d 151, 160, 248 P.3d 512 (2011).

act after something like this.'" When asked what he observed Rafay doing instead of calling his family, Gomes replied, "You know, he was just chillin' with his buddy." The trial court sustained the defense objection and instructed the jury to disregard the characterization. Gomes then explained, without objection, that he had observed, "They had gone to Barnes & Noble, they had sat around and read, and then that was just it. He was not attending to any of the business that I think you need to attend to after the death of a family."

¶163 Later, during redirect, Gomes again explained why he thought that even though notifications would be difficult, it was ultimately Rafay's obligation to contact other relatives and help make the necessary funeral arrangements. When asked what the "issue" was that he wanted to discuss with Rafay on July 14, Gomes explained that it was not the police department's *ability* to contact the extended family or specific relatives to make funeral arrangements: "The issue was why wasn't he doing it? He was watching videos, movies, he was reading." Defense counsel objected that the question called for speculation. The trial court sustained the objection and struck Gomes's description of Rafay's activities.

¶164 Gomes also explained that the defendants had recounted the events of the hours before the murder in "tremendous detail" but did not remember details about the preceding days. He then offered the observation that "now[,] whether they couldn't give me information or were not willing to give me information . . . ." Defense counsel objected, and the trial court struck the response. Gomes later speculated that when Rafay yelled about the theater curtain malfunction, it was "another detail, you know, I guess he wanted to be noticed." Once again, the trial court sustained the defense objection and instructed the jury to disregard the comment.

¶165 After the murders, Rafay told officers that he went into his father's bedroom and stood near a white bookshelf. Although it was dark, Rafay claimed he saw a large blood splatter on the wall and his father's feet. Rafay was uncertain whether he had gone any farther into the room.

¶166 On August 9, 1994, Gomes returned to the Rafay home at about 11:00 p.m. to re-create the lighting conditions in Tariq's bedroom at the time of the murder: "I wanted to personally view what he said he did and then weigh what he was saying to me. Was it accurate or inaccurate or was it fabricated or not?" Gomes then stood next to the white bookshelf, with only the hall light on, and reported that "I personally could not see the detail that he was talking about." Explaining why he thought the reenactment answered a question, Gomes stated, "I don't believe he saw what he said he saw." The trial court sustained defense counsel's objection and instructed the jury to disregard Gomes's conclusion.

¶167 Because the trial court sustained objections to each of Gomes's challenged remarks, the primary issue is whether the remarks were so prejudicial that this court cannot presume the jury followed the curative instructions.[138]

¶168 Gomes's editorial comments and the expression of his personal belief about Rafay's ability to see the blood spatters on the wall were clearly improper. The State does not suggest otherwise. But Gomes testified, in great detail and without objection, about Rafay's inability or unwillingness to contact his relatives after the murders and about his other observations of Rafay's actions before Burns and Rafay left for Canada. Gomes also testified, without objection, about the purpose of the lighting re-creation, which was to determine whether Rafay's description was "inaccurate or . . . fabricated" and the fact that he was unable to see the detail that Rafay had reported.

---

[138] *See State v. Miles*, 73 Wn.2d 67, 71, 436 P.2d 198 (1968).

¶169 Because the jury had before it substantial evidence about these matters and Gomes's challenged comments did not inject any new issues or details, the potential prejudice of the improper remarks was significantly reduced. The defendants do not allege that the State repeated or based any argument on the improper comments, and the jury was also instructed that it was the sole judge of credibility. Under the circumstances, we are convinced that in each instance, the jury was able to follow the trial court's prompt curative instructions and make its factual determinations based solely on the evidence properly admitted.[139]

*Violation of In Limine Orders—Basis for Mistrial*

¶170 The defendants next contend that several State witnesses violated the trial court's in limine orders. They argue that the trial court erred in denying their motions for mistrials following the challenged comments.

¶171 We review the trial court's decision to grant or deny a mistrial for an abuse of discretion.[140] That decision will be overturned only when a " 'substantial likelihood' " exists that the prejudice affected the jury's verdict.[141] To determine whether an irregularity affected the outcome, a reviewing court considers (1) the seriousness of the irregularity, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it.[142]

---

[139] *See Hager*, 171 Wn.2d at 160 (curative instruction sufficient to cure detective's improper characterization of defendant as " 'evasive' "); *State v. Warren*, 165 Wn.2d 17, 28, 27, 195 P.3d 940 (2008) (trial court instruction on reasonable doubt cured prejudice resulting from the prosecutor's argument that the jury was not required to give the defendant the " 'benefit of the doubt' ").

[140] *State v. Rodriguez*, 146 Wn.2d 260, 269, 45 P.3d 541 (2002).

[141] *Russell*, 125 Wn.2d at 85 (quoting *State v. Crane*, 116 Wn.2d 315, 332-33, 804 P.2d 10 (1991)).

[142] *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

*Gomes and Thompson—Prior Convictions*

¶172 Before trial, the trial court granted a defense motion to exclude testimony about the defendants' involvement in "theft, stealing, etc." During direct examination, Detective Gomes explained, without objection, his purpose in traveling to Canada shortly after the murders: "We wanted to know their relationship with their friends, if they had a criminal history from the jurisdiction that they lived at or had grew [sic] up at as children in West Vancouver, and things of that nature." The prosecutor did not ask any additional questions on this topic. During cross-examination, defense counsel asked Gomes to clarify that the defendants had no "criminal convictions in Canada." Gomes responded, "Convictions?" and then, "Not to my knowledge."

¶173 During direct examination, the deputy prosecutor asked Detective Thompson, apparently accompanied by gestural "quotation marks" around the word "convictions," whether the defendants had any criminal convictions in Canada or in the United States. Thompson responded that neither defendant had criminal convictions.

¶174 After argument, the trial court denied defense counsel's request to inform the jury that the defendants had not previously been charged with any crimes, declining to permit the parties to delve into the area of prior arrests or suspected criminal conduct. Defendants contend that the deputy prosecutor's gestures and the detectives' manner of answering improperly left the impression that the "jurors were not hearing the whole story."

¶175 Defendants' challenge to the testimony of Detectives Gomes and Thompson rests not on the content of their responses, which is unchallenged, but rather on the witnesses' alleged tone of voice and on the deputy prosecutor's use of "air quote" gestures to frame the questions. They argue these actions implied that evidence of "nefarious

conduct" and a history of criminal conduct was being withheld from the jury.

¶176 The trial court is necessarily in the best position to assess the prejudicial effect, if any, of alleged courtroom gestures and the participants' tone of voice. The defendants have not identified any specific comments or arguments by the prosecution suggesting that the defendants had committed some "nefarious" prior act or had a prior history of criminal conduct. On this record, we must defer to the trial court's assessment of the gestures and tone of voice used in the courtroom. Under the circumstances, the comments about the lack of prior "convictions" did not warrant a mistrial.

### Officer Larry Overcast

¶177 Officer Larry Overcast testified about his conversations with the defendants when they crossed the border into the United States in Sweet Grass, Montana, on October 11, 1994. Before his testimony, Overcast was informed that he would be permitted to testify that Burns had a "bar I.D. [identification]" but would not be permitted to testify about the form of the identification or the fact that it had another person's name on it.

¶178 During direct testimony, when asked if he found anything suspicious in Burns's possession, Overcast responded, "I located a British Columbia driver's license bearing the name of another person." When asked to explain why that was suspicious, Overcast explained that as a border inspector, he was concerned that someone might be attempting to cross the border with someone else's identity. Burns told Overcast that he used the identification as a "bar I.D." Defense counsel raised no objection.

### Lorne Schwartz

¶179 The parties also discussed with Lorne Schwartz, an RCMP investigator, the permissible parameters of his testimony. Schwartz was informed that he would not be per-

mitted to disclose that the defendants had retained counsel, offer an opinion on whether the defendants were cooperating with the Bellevue Police Department, whether the defendants had been arrested on other charges, whether the defendants were suspected of other criminal behavior, and whether the defendants were being investigated for "accessory after the fact charges."

¶180 During Schwartz's testimony about the mechanics of placing intercepts, the deputy prosecutor asked, "[C]an you tell us what telephones, houses, apartments, and cars you were given authorization to . . . plant listening devices in or connect listening devices to?" Schwartz replied, "I can. But because of this morning's instruction, I don't know if I want to be complete in that answer."

¶181 At a sidebar, defense counsel complained that Schwartz's comment suggested information was being withheld. Schwartz explained that he thought he was not supposed to talk about intercepts at certain locations because of the limitation on testimony about the "accessory after the fact." The parties agreed that the comment was inappropriate and that the question was directed simply to a factual disclosure of the locations where the intercepts were being placed. The trial court eventually concluded that the comment was "probably inappropriate" but that it was not "much of anything." When Schwartz resumed his testimony, he identified the individuals and addresses that were authorized for intercepts.

¶182 Any alleged errors in the testimony of Overcast and Schwartz were benign. Although Overcast violated the court's order by identifying the specific type of false identification that Burns had in his possession, later testimony made it clear that Burns had not used a false identity to cross the border and that both defendants had fully identified themselves to the border agent and informed him about the murders. When Overcast's testimony is viewed in its entirety, the defendants' suggestion that the jury could

have inferred that Burns "might attempt to cross international borders using an alias" is not persuasive.

¶183 Inspector Schwartz merely expressed uncertainty about whether the court ruling would allow him to identify all of the locations where he placed the intercepts. The comment did not disclose any improper information, and when Schwartz's testimony resumed, he identified all of the locations of the intercepts.

¶184 The trial court did not abuse its discretion in denying a mistrial based on Overcast's and Schwartz's testimony.

*Detective Thompson—Dosanjh Group*

¶185 In January 2004, after trial had started, Detective Thompson spoke with members of the Vancouver Police Department to learn more about the Dosanjh crime group as it existed in 1994. According to the State's offer of proof for potential rebuttal purposes, Thompson learned that the Dosanjh group had been involved with cocaine smuggling and that the group consisted of two brothers, both of whom had been killed before the Bellevue murders occurred. Thompson also learned there was no information linking Jesse Brar to the Dosanjh group.

¶186 Concerned about a potential "bottomless pit," the trial court indicated that it did not intend to permit evidence "about whether a crime family exists or doesn't exist at this point in time." The court later confirmed that "[w]e're not going to get into that Dosanjh family and whether they made the money selling dope or whether they didn't."

¶187 When the deputy prosecutor cross-examined Thompson during the defense case in chief, the trial court sustained objections to questions about what the Dosanjh group was. The trial court permitted Thompson to state that

he was unable to uncover evidence that any member of the Rafay family was associated with the Dosanjh group, that "any aspect of the Rafays' life was associated with the type of criminal organizations that the Dosanjh group was involved with," that the Rafay family was involved in any kind of criminal organization, or that the Rafay family had any connections to Jesse Brar.

¶188 When asked what aspect of the Rafay family lifestyle led him to the conclusion that it had no connection with the Dosanjh group, Thompson replied, "The Rafay family was a middle class Muslim family, working class. He had a job with $59,000 a year or so, he owed no bills, they were not involved in drug trafficking."

¶189 At this point, the trial court sustained the defense objection, ordered the reference to drug trafficking stricken, and directed the jury to disregard the reference. A short time later, when asked whether he had determined whether any of the four members of the Rafay family were connected to or members of the Dosanjh group, Thompson replied, "No. What I determined, there was no Dosanjh group at the time." Once again, the trial court sustained the defense objection and ordered the jury to disregard the answer after "no."

¶190 At the next break, defense counsel objected vigorously, arguing that the State's question was intended to violate the court's orders limiting any reference to the Dosanjh group's existence or participation in drug trafficking. The trial court noted that the defense would be able to "plumb the depths" of Thompson's investigation but declined to expand the scope of earlier rulings to allow the defense to bring in the Mohammed or FUQRA tips. The trial court also summarily denied the defense motion for a mistrial.

¶191 The defendants do not challenge Thompson's testimony that his investigation showed no evidence of a rela-

tionship between any member of the Rafay family and the Dosanjh group, or that any aspect of the Rafay family's life indicated some association with the Dosanjh group or with any kind of criminal organization, or that there was any connection between the Rafay family and Jesse Brar. And as the trial court noted, it permitted the defendants to cross-examine Thompson thoroughly about these matters. Moreover, any evidence of a connection between the Dosanjh group and the murders was highly speculative. The potential prejudice resulting from the challenged testimony was therefore slight. There is no reasonable likelihood that the improper comments about the Dosanjh group affected the outcome of the trial. The trial court did not abuse its discretion in denying the defendants' motion for a mistrial.

*Issue 7: Whether the Trial Court Erred in Dismissing Juror 4*

¶192 Following a series of juror communications occurring over the course of two months, the trial court excused a sitting juror for misconduct and hardship. Burns and Rafay contend that the trial court acted without a sufficient investigation or factual basis. But the trial court excused the juror only after conducting a detailed inquiry and determining that she was clearly distracted, unable to concentrate on the trial, and unable to perform her duties as a juror. Because the record supports these determinations, the trial court did not abuse its discretion in removing the juror.

¶193 After jury selection concluded on November 13, 2003, the trial court empanelled a total of 20 jurors. Trial began on November 24, 2003. The court provided jurors with note pads and instructed them not to discuss any notes with other jurors until deliberations and to leave the note pads in the courtroom during all breaks. The court permitted jurors to submit potential questions for witnesses on pages torn from the note pads.

¶194 On February 18, 2004, nearly three months into the trial, juror 19 submitted a note to the trial judge expressing concerns about juror 4's potential motives during deliberations. Juror 19 claimed that other jurors had heard juror 4 say something about "fighting her battles during deliberation," apparently in reference to the lack of heat in the courtroom. Those jurors had also heard juror 4 make angry comments about the situation during a telephone call to her husband. The trial judge declined the deputy prosecutor's suggestion to investigate the matter further at this point, concluding that it appeared to be nothing more than an inevitable personality clash resulting from the length of the trial and an aging courtroom.

¶195 On February 24, 2004, six jurors signed a note to the trial judge expressing annoyance with juror 4's constant "snorting and coughing problems." The trial judge expressed concern about whether the "personal relationships" problems might be approaching the level of juror misconduct but decided he would try changing the seating assignments before undertaking any more serious measures.

¶196 Later the same day, the deputy prosecutor informed the judge that he had been observing the jurors during testimony about Burns's recorded interview shortly after the murders and that all of them except juror 4 had been following the written transcript. He attempted to demonstrate juror 4's physical position and maintained that all of the jurors were "turning to see what's going on with juror number four." The trial judge expressed concern because he had observed the "same physical body movements" and informed the parties that he had watched juror 4 for the past several days "and there does appear to be an absolute lack of attention in the last couple days." The judge shuffled the seating on March 1, 2004, but took no further action.

¶197 On March 8, 2004, during Jimmy Miyoshi's video-taped deposition testimony, a juror complained that juror 4 had been sleeping. The trial judge indicated he had not seen the incident but acknowledged that he was at the "ragged edge" with juror 4. After further discussion with counsel, the judge gave the jury a "pep talk" about paying attention but took no further action.

¶198 On April 14, 2004, juror 19 sent a note to the trial judge:

> During our afternoon break [juror 4] made a remark about serving on this jury. She stated that she will do whatever she has to do to be dismissed! I advised her to talk to you, but it bothered me and I wanted you to know. It appears to me that she is not taking serving on this jury serious which is so unfair to our defendants.

The judge decided to question juror 19 to "see what's behind this damn note." Juror 19 explained that during a break on the previous day, juror 4 had told a group of jurors that " 'I will do anything I can to get off this fucking jury.' " Juror 19 said juror 4 had frequently expressed a similar desire to be off the jury and that she had on occasion appeared to be writing letters, rather than taking notes, and then placing them in her pocket. Juror 19 acknowledged that she had never seen what juror 4 was writing.

¶199 The court then questioned all but two of the remaining jurors.[143] Four of the jurors reported hearing juror 4 say she would do anything to get off "the jury" or "the fucking jury." When one juror told juror 4 she should write to the judge, juror 4 responded that " 'I already have, and it didn't do any good.' " Nine jurors did not see or hear the incident.

¶200 Several jurors had noticed that juror 4 was not paying attention, was falling asleep, appeared to be writing letters rather than taking notes, and was improperly re-

---

[143] The court's questioning included alternate jurors.

moving note pad pages from the courtroom. One juror said juror 4 had been having increasing problems staying awake during the previous week. Several jurors had seen juror 4 writing in her note pad and then removing pages from the courtroom. The jurors did not believe these pages involved questions because they contained too many words.

¶201 Juror 4 acknowledged that she had occasionally expressed a desire to go home but denied saying anything as graphic as "this fucking jury." She denied writing letters in court or removing any sheets from her note pad, except for the sheets used to submit questions. Any other sheets she had torn out remained with the note pad. She explained that she was writing a book that was not about the case and made notes about the book in a journal she kept in the jury room. She also denied writing a letter to the judge informing him that she did not want to be on the jury.

¶202 Juror 4 admitted having problems staying awake "a time or two" and that she had telephoned her husband and complained about the "petty conflicts" that had occurred. She acknowledged personal problems involving her teenage son but did not think they would interfere with her ability to serve. She explained that because of poor, uncorrectable vision, she held transcripts closely in order to follow them. She claimed that she remained the "neutral person" while some of the other jurors engaged in ongoing "garbage."

¶203 Over defense objections, the trial court excused juror 4 for misconduct and on hardship grounds. The court cited "clear evidence," based on its own observations and the observations of other jurors, that juror 4 had been sleeping, taking sheets of paper from the courtroom in violation of the court's order, used graphic language in expressing her desire to get off the jury, and then lied about these matters to the court. The court noted juror 4's personal issues, including asthma problems and the newly disclosed vision problems.

¶204 The court found that the circumstances, considered together, established that juror 4 was "distracted, and that she is unable to concentrate on this trial, and unable to do her job as a juror, even though she assures this court that she can and wants to." The court declined defense counsels' requests to examine the jurors further, review juror 4's note pad, or dismiss other jurors for misconduct. The court also denied defense motions for a mistrial.

¶205 RCW 2.36.110 governs the removal of jurors:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

CrR 6.5 sets forth the procedure for selecting alternate jurors and provides, in part, that "[i]f at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." "RCW 2.36.110 and CrR 6.5 place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror."[144] When determining whether the circumstances establish that a juror engaged in misconduct, the trial court need not follow any specific format.[145] We review the trial court's decision to remove a juror for an abuse of discretion.[146]

---

[144] *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

[145] *Jorden*, 103 Wn. App. at 229.

[146] *Jorden*, 103 Wn. App. at 226; *State v. Depaz*, 165 Wn.2d 842, 858, 204 P.3d 217 (2009). When a deliberating juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law, the juror "cannot be dismissed when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence." *State v. Elmore*, 155 Wn.2d 758, 778, 123 P.3d 72 (2005). Our Supreme Court has recently reaffirmed, however, that the

¶206 In assessing alleged juror misconduct, the trial judge necessarily acts as "both an observer and decision maker."[147] Because such " 'fact-finding discretion' " allows the judge to weigh the credibility of jurors, we must accord the court's decision substantial deference.[148]

¶207 Here, contrary to defendants' suggestion, the trial court did not act hastily in removing juror 4. By the time it began its inquiry on April 14, the trial court had been aware of potential problems for about two months. The court had repeatedly observed juror 4's conduct in the courtroom and had discussed the incidents at length with counsel. The record establishes that the court was extremely reluctant to intrude into the juror relationships and repeatedly resisted the State's requests to investigate the jury room allegations. Without any objection from defense counsel, the court made every effort to resolve the issues by means of seating adjustments and oral admonishments. When the court finally determined that it was necessary to inquire into the issues with the jurors, it carefully questioned the jurors without the use of leading questions and then permitted both sides to question the jurors in great detail.

¶208 When making its decision, the trial court considered its own observations of juror 4's conduct in court, the observations of almost all of the other jurors, and juror 4's detailed denials and explanations. Several jurors and other witnesses had observed juror 4's inattention and sleeping, her apparent use of the note pad for purposes other than notes or questions, and her removal of note pad pages from

---

"reasonable possibility" standard applies only in these rare situations. *Depaz*, 165 Wn.2d at 858 (refusing to extend standard to removal of a deliberating holdout juror). Such special circumstances are not present here.

[147] *Jorden*, 103 Wn. App. at 229.

[148] *Jorden*, 103 Wn. App. at 229 (quoting *Ottis v. Stevenson-Carson Sch. Dist. No. 303*, 61 Wn. App. 747, 753, 812 P.2d 133 (1991)).

the courtroom, in violation of the court's order. Although juror 4 denied much of the alleged misconduct, the trial court found the other jurors more credible and concluded that juror 4 had lied about her desire to remain on the jury and the removal of materials from the courtroom and that she was minimizing the effects of her personal and physical problems, including sleeping in court. Under the circumstances, the record supports the trial court's determination that juror 4's inattention, distraction, physical and personal problems, and desire to be off the jury rendered her unable to perform her duties as a juror.

¶209 Defendants have recited the contents of juror 4's note pad in great detail, alleging that they reveal her to be a "thoughtful and attentive" juror.[149] But the substance of these notes does not undermine the validity of the trial court's assessment of juror 4's actions in the courtroom, which was based on its own observations and the statements of other jurors.[150] The trial court did not abuse its discretion in removing juror 4 or denying the defense's motion for a mistrial.[151]

*Issue 8: Whether the Trial Court's Special Verdict Instructions Misstated the Jury Unanimity Requirements*

¶210 For the first time on appeal, Burns challenges the trial court's instructions for completion of the special verdict forms for aggravating circumstances.[152] Relying upon *State v. Bashaw*,[153] he contends the trial court im-

---

[149] The defendants do not dispute the State's assertion that more than 20 pages from juror 4's note pad are missing.

[150] *Cf. Elmore*, 155 Wn.2d at 778-79.

[151] *See Jorden*, 103 Wn. App. at 229.

[152] Rafay made the same challenge in his briefing. After oral argument, he moved to withdraw this argument. We grant that request.

[153] 169 Wn.2d 133, 234 P.3d 195 (2010).

properly instructed the jury that they had to be unanimous to answer "no" on these forms. After completion of the briefing and oral argument in this case, our Supreme Court issued its opinion in *State v. Guzman Nuñez*,[154] which overruled *Bashaw* and the nonunanimity rule. Burns's challenge fails.

*Issue 9: Whether Prosecutorial Misconduct during Closing Argument Violated the Defendants' Right to a Fair Trial*

¶211 Defendants contend that deputy prosecutor James Konat violated their right to a fair trial when he committed multiple acts of misconduct during closing argument. A defendant alleging prosecutorial misconduct bears the burden of demonstrating that the challenged comments were both improper and prejudicial.[155] Misconduct is prejudicial if there is a " *'substantial likelihood'* " that it affected the jury's verdict.[156] We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.[157]

¶212 If a defendant fails to object, we will not review the alleged misconduct unless it was so flagrant and ill intentioned that no instruction could have cured the resulting prejudice.[158] If the prosecutor flagrantly or intentionally appeals to racial bias "in a way that undermines the defendant's credibility or the presumption of innocence," a court will vacate the conviction unless it appears beyond a reasonable doubt that the misconduct did not affect the jury's verdict.[159]

---

[154] 174 Wn.2d 707, 285 P.3d 21 (2012).

[155] *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

[156] *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007) (emphasis omitted) (quoting *McKenzie*, 157 Wn.2d at 52).

[157] *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

[158] *Stenson*, 132 Wn.2d at 719.

[159] *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

*Comparison of Murders to Terrorist Beheading*

¶213 Shortly after beginning closing argument, deputy prosecutor Konat stated,

> I want to speak for just a moment, because I know it's been a long time that we've been here, and I think it's important that we not lose sight of what we're talking about.
>
> This is the State of Washington versus Atif Rafay and Glen Sebastian Burns, but the people who were murdered in this case were human beings. *They were human beings who were executed in a fashion that is not unlike something that has been in the news lately.*
>
> *Last week, or some days ago, an American civilian was beheaded. He was beheaded by some people—*
>
> [Defense Counsel]: Excuse me. I am sorry, Counsel, I have to object to this argument. It is completely inappropriate.
>
> The Court: Objection's noted. This is argument. I am going to allow all sides some latitude in argument. Your objection's noted.

(Emphasis added.) The deputy prosecutor continued,

> He was beheaded as an apparent retaliation for mistreatment of Iraq's war prisoners, as I understand it, at the hands of American military personnel.
>
> So that [defense counsel] is clear and that you all are clear as well, I don't raise this subject to somehow make light of an American civilian being executed. Even more grotesque is the notion that they took the time to video tape it before they did, and that is ultimately what led to the outrage all over the world about what had happened.
>
> *I bring this up because as grotesque and as horrible as that notion is, what these two did to Tariq Rafay, Sultana, and Basma Rafay is even worse.*

(Emphasis added.)

¶214 A short time later, deputy prosecutor Konat made two additional references to the beheading, in conjunction with the crime scene photographs that he was using to

illustrate his comments and the State's repeated theme that the defendants had "executed" Rafay's parents:

To put this entire event in context, if we could go to the next slide, please . . . . This, ladies and gentlemen, is how Atif Rafay and Sebastian Burns left Sultana Rafay in the basement of their home before they cleaned up and went about the business of creating an alibi for themselves, and after they ambushed and executed Sultana Rafay, they turned their attention to the leader of the house, Dr. Tariq, who they knew would be in bed.

. . . .

This is how they left Dr. Tariq Rafay in his room on the evening of July 12, 1994. *This is why I suggest to you that it is not out of line for me to compare what they did to these people asleep in their own beds as tantamount to or worse than a beheading.*

Recall, if you will, that this, even as bad as it gets, in fact, both—excuse me, Sebastian Burns, when he calls 911, described what he could see on Dr. Rafay's face, and if we go to the next slide, this is the horror that they left behind, ladies and gentlemen. This is what we must not lose sight of. I say that we must not lose sight of this, because this is what they leave behind, and you must consider what they left behind and the way they acted to fully understand the psychopathic nature of this defense.

. . . .

Before I get to this bad luck story that Mr. Burns told you about last week, we still have one more victim to talk about.

Unlike Sultana Rafay, who had no idea that her attackers were downstairs, or if she did, could not appreciate the risk, and unlike Tariq Rafay, who, as you could see, had no idea what was about to happen to him, and, quite frankly, had no idea what hit him, Basma's situation was very, very different.

*Basma's situation is, in some ways, more like the man who was beheaded last week.* Gagged and caged by her disability, remember, if you will, that she was in her bedroom at the time and that she could not call out for help or dial the—pick up the

telephone and dial 911 and tell them what was going on. Gagged and caged by her disability, she was in her bedroom while Sebastian Burns and Atif Rafay *were systematically executing her parents, and all she could do, much like the man who was executed last week for the whole world to see*, was wait. I don't claim to be able to suggest to you what Basma Rafay was thinking in the moments before her death, and I am a fool if I suggest to you that I could.

(Emphasis added.)

¶215 Defense counsel later moved for a mistrial:

The reason it's objectionable is twofold. First, it is a blatant emotional plea to the jury; and, secondly, given the racial background of Mr. Rafay, being that he's Pakistani, as well as the religious connotations that go with that, I think it is clearly prosecutorial misconduct to try and draw the jury or invite the jury to draw a connection between an event of that nature and these two defendants, particularly Mr. Rafay. And so for that reason I believe it's prosecutorial misconduct and we are moving for a mistrial at this time. It's an extreme prejudice to Mr. Rafay['s] defense.

The trial court denied the motion with no further comment.

¶216 Two days later, before the defense closing argument, Konat's co-counsel proposed a curative instruction. He acknowledged that there might have been "a significant misunderstanding" about the beheading reference and explained that the purpose of the analogy was to demonstrate the defendants' "complete lack of empathy." The trial court offered to give the curative instruction if requested, but the defense did not request one.[160]

---

[160] The proposed instruction provided,

In his closing argument on Tuesday, the prosecutor referred to the beheading of a man in Iraq that has been recently reported in the media.

You are instructed to disregard all such argument and to draw no inferences from it. It should not influence your deliberation in any way, in any respect.

You are officers of the court and must act impartially and with an earnest desire to determine and declare the proper verdict. Throughout your deliberations you will permit neither sympathy nor prejudice to influence your verdict.

¶217 The defendants contend that by comparing the murders to the well-publicized beheading, the prosecutor sought to inflame the jury's passions and encourage a decision based on ethnic, cultural, religious, or patriotic prejudices. Relying on *State v. Monday*,[161] they argue that the State therefore bears the burden of demonstrating that the misconduct was harmless beyond a reasonable doubt.

¶218 In *Monday*, a prosecution for first degree murder and first degree assault, the deputy prosecutor expressed his personal belief in the defendant's guilt and injected racial prejudice into the trial proceedings by invoking an alleged African-American "antisnitch code"[162] to undermine the credibility of witnesses. During trial and throughout closing argument, the deputy prosecutor attempted to reinforce racial stereotypes by means of both overt and subtle derogatory comments. Our Supreme Court concluded that such flagrant and intentional attempts to appeal to racial bias require reversal unless the court is convinced beyond a reasonable doubt that the misconduct did not affect the jury's verdict. The court then reversed Monday's conviction: "The prosecutor's misconduct tainted nearly every lay witness's testimony. It planted the seed in the jury's mind that most of the witnesses were, at best, shading the truth to benefit the defendant. Under the circumstances, we cannot say that the misconduct did not affect the jury's verdict."[163]

¶219 A prosecutor commits misconduct by appealing to fears of criminal groups or by invoking racial, ethnic, or religious prejudice.[164] " '[T]heories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial

---

[161] 171 Wn.2d 667, 257 P.3d 551 (2011).

[162] *Monday*, 171 Wn.2d at 678.

[163] *Monday*, 171 Wn.2d at 681.

[164] *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006).

trial.' "[165] We agree with defendants that the challenged comments here were highly improper.

¶220 By referring to the recent, well-publicized beheading, the prosecutor introduced matters that were not in evidence but perhaps were already on the minds of the jurors. The comments invoked the disturbing images that accompanied newspaper articles of the beheading, as well as the Internet video itself, and could well have engendered a strong emotional response among the jurors completely unrelated to the facts of the charged offenses. And the circumstances surrounding the beheading had at least the potential to resonate with any racial, religious, or ethnic prejudice among jurors. The State's proposed curative instruction clearly suggests that the deputy prosecutors recognized this possibility.

¶221 The State claims that the deputy prosecutor properly referred to the "horrible" nature of the crime scene in conjunction with the argument that the defendants' reactions to that crime scene were consistent with guilt. This contention is not persuasive.

¶222 The State is not precluded from accurately characterizing the nature of a horrific crime.[166] But the prosecutor also has a duty to seek verdicts that are free from appeals to passion or prejudice.[167] Given the evidence that was properly before the jury, including the images that the deputy prosecutor projected as he spoke, the references to current events were entirely gratuitous.

¶223 We must, however, assess the effect of the improper comments in light of all of the surrounding circumstances, including the lengthy trial and the remainder of the closing

---

[165] *Monday*, 171 Wn.2d at 678 (alteration in original) (quoting *State v. Dhaliwal*, 150 Wn.2d 559, 583, 79 P.3d 432 (2003) (Chambers, J., concurring)).

[166] *See State v. Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968).

[167] *See State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

argument. Unlike the cases cited by the defendants, the improper comments here were not an open call to convict the defendants on the basis of racial, ethnic, or religious prejudices. In *State v. Belgarde*,[168] a member of the American Indian Movement (AIM) was charged with murder. During closing argument, the deputy prosecutor deliberately inflamed the jury's prejudice and passion and argued facts not supported by the evidence by comparing AIM to a " 'deadly group of madmen' " on par with " 'Sean Finn [or] Kadafi—feared throughout the world.' "[169] The prosecutor then invited the jury to consider Wounded Knee, stating, " 'Wounded Knee . . . is one of the most chilling events of the last decade. You might talk that over once you get in there. That was the American Indian Movement. That was a faction of the American Indians that were militant, that were butchers, that killed indiscriminately.' "[170]

¶224 In *State v. Perez-Mejia*,[171] the prosecutor argued, among other things,

> "Send a message to Scorpion [the defendant's nickname], to other members of his gang . . . and to all the other people who choose to dwell in the underworld of gangs. That message is we had enough. We will not tolerate it any longer. That we as citizens of the State of Washington and the United States of America, we have the right to life, liberty and the pursuit of happiness and we will no longer allow those who choose to dwell in the underworld of gangs to stifle our rights. And that message begins now.
>
> "It begins now by finding that the defendant was involved in the death of Ms. Emmitt. That message can be sent by holding the defendant responsible for his actions, for his involvement in

---

[168] 110 Wn.2d 504, 755 P.2d 174 (1988).

[169] *Belgarde*, 110 Wn.2d at 506 (emphasis omitted).

[170] *Belgarde*, 110 Wn.2d at 507 (emphasis omitted).

[171] 134 Wn. App. 907, 917-18, 143 P.3d 838 (2006) (second alteration in original) (footnote omitted).

the gang. For him being an accomplice to his other gang members in the death of Ms. Margaret Emmitt."

¶225 This court found that these comments (and others) improperly invoked the jurors' patriotic sentiments and, having done so, cast the defendant as an oppressor of the inalienable rights listed in our nation's Declaration of Independence. These appeals to prejudice and patriotism were unquestionably improper. [*State v.*] *Neidigh*, 78 Wn. App. [71,] 79[, 895 P.2d 423 (1995)]. This argument needlessly injected the sensitive issues of nationality and ethnicity into a case where the defendant and his associates were alleged members of a Central American gang, many of whom, including Soto-Rodriguez, required Spanish language interpreters during the trial.[172]

¶226 Here, the improper comparisons occurred during a minor portion of the lengthy closing argument. The deputy prosecutor did not compare the defendants directly with the terrorists or elaborate on the political motives underlying the terrorists' actions. Rather, he continued with the general theme—the violence of the murders—by focusing on the evidence properly before the jury and illustrating the arguments with photographs of the crime scene. Unlike *Monday*, the deputy prosecutor here did not seek to exploit or reinforce extensive misconduct that had occurred during trial. Nor did the misconduct "taint[ ] nearly every lay witness's testimony."[173]

¶227 When viewed in context, the alleged racial, religious, and ethnic connotations ascribed to the improper comments are too attenuated to bear the weight that defendants accord them. Consequently, the remarks here, although improper, do not trigger the heightened standard adopted in *Monday*. We conclude that under the circum-

---

[172] *Perez-Mejia*, 134 Wn. App. at 918.

[173] *Monday*, 171 Wn.2d at 681.

stances, there was no substantial likelihood that the references to the beheading affected the outcome of the trial.

### Reference to Father's Recent Death

 ¶228 Defendants next contend that deputy prosecutor Konat committed misconduct during rebuttal closing argument when he referred to the recent death of his father:

> I want to tell you something. I have just one little thing to share with you. *I was gone for a couple of days because my father died, and for those of you who haven't lost a parent, I encourage you to go back there and listen to the people who have and listen to the people on this jury who have lost a parent,* and then you attempt to make sense of the way that these defendants laughed and giggled and snickered at the notion of their family, that is Atif Rafay's family, being murdered.

(Emphasis added.)

¶229 The defense later moved for a mistrial, arguing that the comments were a "blatant attempt . . . to garner good feelings, emotions, whatever you want to call them, of the jury" and also in violation of an agreement that the reason for Konat's temporary absence would not be mentioned to the jury. The court expressed concern about the remarks but denied the mistrial.

¶230 Contrary to the State's assertions, the comment sought to establish a shared experience between deputy prosecutor Konat and jurors who had lost a parent and contrast that experience with Rafay's response to the murders. As such, it constituted an improper emotional appeal.

¶231 Nonetheless, the comment was a brief, one-time assertion, and the deputy prosecutor immediately moved on to asking the jury to draw inferences based on the evidence. Under the circumstances, we conclude there was no reasonable likelihood that the improper references affected the jury's verdict.

*Jennifer Osteen*

¶232 Defendants contend that deputy prosecutor Konat committed misconduct by suggesting that Jennifer Osteen, a waitress at Steve's Broiler on the night of the murders, was intoxicated when she testified as a defense witness.

¶233 During the initial closing argument, the deputy prosecutor, without objection, reminded the jury of the instruction allowing consideration of a witness's manner, memory, and demeanor while testifying and then encouraged the jury "to remember the way [Osteen] had to navigate the stairs, both, into and out of the courtroom." During the defense closing, counsel referred to the comment as a "cheap shot" and suggested that Osteen had been "obviously terrified."

¶234 During rebuttal, the deputy prosecutor responded,

Let me tell you, last week was a challenge when Ms. Osteen was here, and I tried to be as polite as I could with her, but you saw the way she went up the stairs and you saw the way that she came down, *and I smelled the way she was when she went up and down the stairs.*

[Defense Counsel]: Your Honor, I will object and ask that the jury be—

The Court: They will be, Mr. Robinson. I am going to sustain that objection and instruct the jury to disregard that remark and ask Mr. Konat to move to another argument or phase of your argument.

(Emphasis added.)

¶235 The deputy prosecutor continued as follows,

You have an instruction that tells you the things that you are to consider when trying to determine the credibility of a witness is their manner, their memory, and their demeanor while testifying.

The point that we were trying to establish with Ms. Osteen last week was she didn't wait on them like she first told the detectives. She was wrong about the time that they arrived. Like she first told the detectives, she somehow wanted you to believe that everybody, whoever works in a bar always now has their watch set 20 minutes behind. Until I helped her understand that, what she really meant was ahead. She couldn't read 1:15 or 1:20 from her transcript, when it was really 12:15 or 12:20, and what I am suggesting to you, this isn't about Jennifer Osteen, for God's sake, what this is about is about the witness at Steve's Broiler who had the most contact with them, the witness who could say, "I looked at my watch when they walked in. I can tell you what time they got there," and that's Christine Mars, and she said at 12:50 to 1:00, in no uncertain terms.

¶236 The trial court later denied the defense request for a mistrial, concluding that the curative instruction had remedied any prejudice.

¶237 The deputy prosecutor has wide latitude to draw reasonable inferences from the evidence.[174] But the prosecutor may not refer to evidence that was not presented at trial.[175] By reciting his personal observations of Osteen as she entered and left the witness stand, the deputy prosecutor improperly introduced evidence not presented at trial and not properly before the jury for consideration.[176]

¶238 Defendants argue that Osteen was a crucial defense witness and nothing short of a mistrial would have cured the resulting prejudice. No one reported seeing the defendants between about 10:00 p.m., shortly after the movie began, and when they appeared at Steve's Broiler.

---

[174] *Davis*, 152 Wn.2d at 716.

[175] *Russell*, 125 Wn.2d at 87.

[176] *See State v. Klok*, 99 Wn. App. 81, 85, 992 P.2d 1039 (2000) (improper for deputy prosecutor to comment on defendant's off-the-stand demeanor and invite jury to draw from it negative inferences about defendant's character).

The State maintained that the intervening period was sufficient for the defendants to commit the murders and clean up. The defendants' arrival time at the restaurant was therefore important to both sides' theory of the case.

¶239 Osteen testified that she saw or spoke to the defendants "around 12:00, 12:30 [a.m.]." She characterized their appearance as "grubby," suggesting they had not cleaned up recently, and expressed her belief that the Bellevue police had attempted to persuade her to change her time estimate. But the State's witnesses—other waitresses at the restaurant—testified that the defendants had arrived at the restaurant sometime after 12:15 a.m. or 12:30 a.m., and as late as 12:50 a.m. Osteen's general time estimates were therefore not fundamentally at odds with the testimony of the other witnesses, and the discrepancies in the perceived arrival times are not sufficient to completely undermine either side's theory of the case.

¶240 The trial court quickly sustained the defense's objection and directed the jury to disregard the remark. The deputy prosecutor immediately moved on to a proper argument. The court also repeatedly instructed the jury that counsel's arguments were not evidence. Under the circumstances, the trial court's curative instruction was sufficient to obviate any potential prejudice.[177] The improper comments did not affect the defendants' right to a fair trial.

*Believing Burns or Believing the Undercover Police Officers*

¶241 In a separate argument, Burns contends that deputy prosecutor Konat committed reversible misconduct near the end of rebuttal closing argument when he stated,

> What I am suggesting to you is you can't believe for a moment what any of them [defendants] said. They'd been living a lie for nine years about their involvement in these murders and you all know that's the truth. You must ignore every— when I stood up this morning or this afternoon I told you that we are now polarized.

---

[177] *See Klok*, 99 Wn. App. at 85.

> *You must either believe everything Sebastian Burns told you in order for this unbelievable story of his to be true, or it seems to me you have to believe what Gary [Shinkaruk] and Al [Haslett] told you* as they documented it through the months that they attempted to let—or they attempted and/or encouraged to have these two killers let their guard down enough to believe that they were among their own kind.

(Emphasis added.) The defense raised no objection. Relying primarily on *State v. Fleming*[178] and *State v. Barrow*,[179] Burns argues that the deputy prosecutor improperly informed the jury that to acquit him, it had to find that the State witnesses were lying or mistaken.

¶242 A prosecutor may not argue that to *acquit* a defendant, the jury must find that the State's witnesses are either *lying* or *mistaken*.[180] Such arguments may undermine the presumption of innocence, shift the burden of proof, and mislead the jury because "[t]he testimony of a witness can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved."[181]

¶243 In *Fleming*, a prosecution for second degree rape, the court found misconduct when the deputy prosecutor stated during closing argument that " 'for you to find the defendants . . . not guilty of the crime of rape . . . , you would have to find either that [the victim] has lied about what occurred . . . or that she was confused; essentially that she fantasized what occurred.' "[182] In *Barrow*, the court found the following argument improper: " '[I]n order for you to

---

[178] 83 Wn. App. 209, 921 P.2d 1076 (1996).

[179] 60 Wn. App. 869, 809 P.2d 209 (1991).

[180] *See Fleming*, 83 Wn. App. at 213.

[181] *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991); *see Fleming*, 83 Wn. App. at 213.

[182] *Fleming*, 83 Wn. App. at 213 (emphasis omitted).

find the defendant not guilty on either of these charges, you have to believe his testimony and you have to completely disbelieve the officers' testimony. You have to believe that the officers are lying.' "[183] The court reasoned that the jurors did not need to " 'completely disbelieve' the officers' testimony in order to acquit Barrow; all that they needed was to entertain a reasonable doubt that it was Barrow who made the sale [to the officer]."[184]

¶244 Unlike the statements found improper in *Fleming* and *Barrow*, the challenged comments here did not expressly contrast an acquittal or finding of not guilty with a jury determination that the State's witnesses were lying. In the remarks leading up to the challenged statements, the deputy prosecutor had argued, among other things, that Rafay's account of what he did after discovering the murders was not credible. And he concluded rebuttal with a clear statement of the State's burden of proof.

¶245 Consequently, when viewed in context, the comment merely highlighted the obvious fact that the two accounts were fundamentally and obviously *different*. The remarks were therefore analogous to those approved in *State v. Wright*,[185] where the court concluded that when the parties present the jury "with conflicting versions of the facts and the credibility of witnesses is a central issue, there is nothing misleading or unfair in stating the obvious: that if the jury accepts one version of the facts, it must necessarily reject the other." The challenged comments were not misconduct.

*Issue 10: Cumulative Error*

▮ ¶246 Defendants contend that even if no individual error warrants reversal, cumulative error denied them a

---

[183] *Barrow*, 60 Wn. App. at 874-75.

[184] *Barrow*, 60 Wn. App. at 875-76.

[185] 76 Wn. App. 811, 825, 822, 888 P.2d 1214 (1995) (footnote omitted) (argument that to believe defendant's account the jury would have to believe that police officers " 'got it wrong' " was not misconduct).

fair trial. Errors that do not individually require reversal may still require reversal if together they violate a defendant's right to a fair trial.[186] But because any errors did not affect the outcome of the trial, the cumulative error doctrine does not apply.[187]

*Issue 11: Rafay's Statement of Additional Grounds for Review*

### Removal of Juror 4

■■ ■■ ¶247 Supplementing his counsel's argument, Rafay contends that the trial court's removal of juror 4 violated his constitutional rights to due process and a fair and impartial jury. He argues that because the removal of juror 4 was analogous to the dismissal of a holdout juror or dismissal arising from a juror's doubts about the sufficiency of the evidence, this court should apply the heightened standard set forth in *State v. Elmore*,[188] which held that the trial court cannot dismiss a deliberating juror "when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence."

¶248 When the trial court dismissed juror 4, the jury had not yet begun deliberations, and there were no accusations involving nullification or the failure to deliberate or to follow the law. Nor is there anything in the record suggesting that juror 4's removal was based on her views about the merits of the case or the sufficiency of the evidence. Rather, the trial court determined that she was inattentive and sleeping during parts of the trial, removed notes from the courtroom in violation of the court's instructions, expressed a desire to get off the jury, and lied to the court when questioned about these allegations. Consequently, the height-

[186] *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

[187] *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

[188] 155 Wn.2d 758, 778, 123 P.3d 72 (2005).

ened standard in *Elmore* does not apply here.[189] Contrary to Rafay's assertions, a defendant "has no right to be tried by a particular juror or by a particular jury."[190]

### Failure To Dismiss Juror 19

¶249 Rafay also contends the trial court erred by failing to inquire into juror 19's alleged misconduct. He argues that because juror 19 lied about juror 4's conduct and was otherwise responsible for stirring up trouble in the jury room, the trial court should have granted the defense motion to dismiss her.

¶250 But the trial court itself had observed juror 4's conduct in the courtroom. Other jurors confirmed many of the allegations about juror 4, and juror 4 herself acknowledged the accuracy of some of the remarks attributed to her, although she disputed certain details and the inferences to be drawn. Rafay has not demonstrated any error or abuse of discretion in the trial court's refusal to discharge juror 19.

### Involuntary Confessions

¶251 Rafay next contends that the defendants' confessions were coerced and involuntary, and therefore inadmissible at trial. He also contends that the trial court failed to make an independent determination of voluntariness and improperly relied on the Canadian court's finding of voluntariness. These contentions are essentially identical to those raised by appointed counsel and will not be addressed here.

¶252 Contrary to Rafay's assertion, defense counsel expressly challenged admission of his confession under the Fifth Amendment at trial. The trial court considered that argument and concluded that admission of the confession

---

[189] *See Depaz*, 165 Wn.2d at 853 (declining to extend *Elmore* standard beyond rare cases involving juror nullification, refusing to deliberate, or refusing to follow the law).

[190] *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

did not violate the Fifth Amendment. Consequently, we need not consider Rafay's claim that the Bellevue Police Department provided such extensive cooperation and assistance to the RCMP operation that the RCMP must be considered as acting under Washington law, thereby limiting admission of the confessions under the "silver platter" doctrine.[191]

### Ineffective Assistance of Counsel

■■ ■■ ¶253 Rafay next contends that he was denied effective assistance when trial counsel failed to recall a witness and failed to object to certain closing arguments by codefendant's counsel. In order to overcome the strong presumption of competent representation, a defendant must show both (1) that the attorney's representation fell below an objective standard of reasonableness and (2) resulting prejudice, i.e., a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different.[192] A failure to establish either element of the test defeats the ineffective assistance of counsel claim. " 'If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel.' "[193]

### Failure To Recall Mark Sidell

■■ ¶254 Rafay contends that defense counsel should have recalled Mark Sidell as a witness. At trial, Sidell, who lived next to the Rafays, testified that on the night of the murders, he had heard various sounds, including "hollow hitting type of sounds," that may have come from the Rafay house sometime before 9:50 p.m.

---

[191] See Gwinner, 59 Wn. App. at 125; State v. Johnson, 75 Wn. App. 692, 699-700, 879 P.2d 984 (1994).

[192] McFarland, 127 Wn.2d at 334-35.

[193] State v. Goldberg, 123 Wn. App. 848, 852, 99 P.3d 924 (2004) (quoting State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002)).

¶255 After his testimony, Sidell sent an e-mail to the deputy prosecutor, who passed it on to defense counsel. When the trial court indicated that the parties might have to bring Sidell back for further questioning, Rafay's counsel responded,

> I just want to say for the record, Your Honor, that there's nothing new in that statement. That is exactly what he said in his first statement that the state has and the second statement he talked about the running, that the police cross-examined him about it.
>
> This is not new information to the state. The only thing new is that he had this typed document that he created.

¶256 Generally, the decision to call a particular witness is presumed to be a matter of legitimate trial tactics.[194] The record shows that defense counsel made a deliberate decision not to recall Sidell after reviewing the contents of the e-mail. Because the e-mail is not part of the record, Rafay's allegations are insufficient to demonstrate that defense counsel's decision was either deficient or prejudicial.

*Failure To Object to Co-Counsel's Argument about Twilight*

¶257 Rafay next contends that counsel was deficient for not objecting when codefendant's counsel stated during closing that "twilight was at 9:44." He argues that this comment effectively misrepresented the time of the murders because twilight began at sunset, which occurred at 9:05 p.m. and ended at 9:44 p.m., when it became completely dark. Counsel's decision about whether and when to object falls squarely within the category of tactical decisions.[195]

¶258 When the challenged argument is viewed in context, it was consistent with both defendants' alibis. Mark Sidell testified that when he heard the "hitting" sounds

---

[194] *Davis*, 152 Wn.2d at 742.

[195] *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007).

from the Rafay house, the sun was going down, "it was starting to get darker and darker, but it was not completely pitch dark at that point." The assertion that twilight was at 9:44 p.m. was reasonably consistent with Sidell's testimony as well as with the testimony of Julie Rackley. Rackley, another neighbor, testified she heard muffled hammering sounds coming from the direction of the Rafay home at a slightly later time. Neither Rackley nor Sidell was able to place a precise time on the sounds that they heard. Counsel's argument was consistent with the defense claim that Sidell's and Rackley's testimony established that the murders occurred at a time when Burns and Rafay were at the movies. Rafay has therefore failed to demonstrate that counsel's failure to object was either deficient or prejudicial.

*Informing the Jury that the Defendants Were in Custody*

¶259 Rafay next contends that counsel should have objected when counsel for Burns disclosed during voir dire that the defendants were in custody. But the challenged questions were clearly based on an attempt to assess potential jurors' understanding about the presumption of innocence. Given the nature of the charges and the obvious, continuous presence of corrections officers in the courtroom, the potential prejudice of the disclosure was minimal at best.[196] Given the purpose and timing of the questioning, counsel's failure to object was clearly a legitimate tactical decision.

*Failure To Object to Admission of the Confessions on the Basis of ER 403*

¶260 Rafay contends that defense counsel's failure to object to the admission of the confessions under ER 403 constituted ineffective assistance of counsel. He argues that the evidence was unfairly prejudicial because (1) the con-

---

[196] *See State v. Mullin-Coston*, 115 Wn. App. 679, 693-94, 64 P.3d 40 (2003) (jurors must be expected to know that a person awaiting trial will also do so in custody).

fessions were unreliable and unsupported by *any* "hold-back" evidence, (2) the statements unfairly associated the defendants with alleged criminals and criminal activities, and (3) the camera angles of the videos focused on the defendants. Rafay offers no meaningful legal argument or citation to relevant authority to support these conclusory allegations, and he concedes the appellate record does not permit a full inquiry into these contentions. Rafay therefore does not demonstrate deficient performance or resulting prejudice.

### Sufficiency of the Evidence

¶261 Finally, Rafay contends that the evidence was insufficient to support his conviction. He relies on the "undisputed" testimony of Rackley and Sidell "prov[ing]" that the murders occurred while the defendants were at the movie theater, the presence of an unidentified hair at the murder scene, inconsistencies in the defendants' confessions, and their ignorance of certain details of the murders. He argues that this evidence was more credible than the State's evidence and therefore should have created a reasonable doubt about the defendants' guilt.

¶262 But because an appellate court resolves a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the State, the mere existence of inconsistent or differing evidence does not negate the sufficiency of the State's evidence.[197] Rafay's arguments do not involve the legal sufficiency of the State's evidence but rather its credibility. Credibility determinations are reserved for the trier of fact, and an appellate court "must defer to the [trier of fact] on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence."[198]

---

[197] *See State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[198] *State v. Liden*, 138 Wn. App. 110, 117, 156 P.3d 259 (2007).

## Conclusion

¶263 For the reasons given in this opinion, we affirm the trial court.

BECKER and DWYER, JJ., concur.

Motions for reconsideration denied July 24, 2012.

Petitions for review denied at 176 Wn.2d 1023 (2013).